UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA

                                      .
Psara Energy, LTD,                    .    Docket #CV-16-4840 (WB)
                                      .
          Plaintiff,                  .
                                      .    United States Courthouse
              vs.                     .    Philadelphia, PA
                                      .    September 16, 2016
Space Shipping, LTD, et al., .             10:55 a.m.
                                      .
          Defendants.                 .
.......................................................

        TRANSCRIPT OF SUPPLEMENTAL ADMIRALTY RULE E(4)(f)
            BEFORE THE HONORABLE WENDY BEETLESTONE
               UNITED STATES DISTRICT COURT JUDGE


     APPEARANCES:

     For The Plaintiff:              Mary E. Reeves, Esq.
                                     Reeves McEwing, LLP
                                     719 E. Passyunk Ave.
                                     Philadelphia, PA 19147

                                     George Tadros, Esq.
                                     Reeves McEwing, LLP
                                     719 E. Passyunk Ave.
                                     Philadelphia, PA 19147

                                     George Gaitas, Esq.
                                     Chalos & Co., PC
                                     7210 Tickner St.
                                     Houston, TX 77055

     For The Defendants:             Richard Q. Whelan, Esq.
                                     Palmer Biezup & Henderson, LLP
                                     Ste. 401
                                     190 N. Independence Mall
                                     Philadelphia, PA 19106

2

                              Neil A. Quartaro, Esq.
                              Watson Farley & Williams
                              250 W. 55th St.
                              New York, NY 10019

                              Zachary Farley, Esq.
                              Watson Farley & Williams
                              250 W. 55th St.
                              New York, NY 10019

     Audio Operator          M. Mani

     Transcribing Firm:      Writer's Cramp, Inc.
                              63 Dakota Drive
                              Hamilton, NJ 08619
                              609-588-8043


     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.

1          THE CLERK:  All rise.  The court is now in session,

2     the Honorable Wendy Beetlestone presiding.

3          THE COURT:  Good morning.

4          ALL:  Good morning, Your Honor.

5          THE COURT:  Have a seat.  Can we make the

6     introductions here, on this side first.

7          MS. REEVES:  Mary Elisa Reeves and my colleague,

8     George Tadros for Reeves McEwing, representing the Plaintiff.

9     And I'd like to introduce George Gaitas from the Chalos firm

10    in Houston who will be arguing --

11         THE COURT:  Okay.

12         MS. REEVES:  -- if it pleases the Court.

13         MR. GAITAS:  And may I introduce, Your Honor, Ms.

14    Depoina Bacha, in-house counsel for Brave Maritime

15    Corporation.

16         THE COURT:  Okay.  And on this side.

17         MR. WHELAN:  Your Honor, Rick Whelan from Palmer

18    Biezup & Henderson, representing the Advantage Defendants as

19    local counsel.  I want to introduce to the court from the

20    Watson Farley firm, Neil Quartaro and Zachary Farley.

21         MR. QUARTARO:  Good morning, Your Honor.

22         THE COURT:  Greetings.  Okay, we're here on

23    Defendant's motion and brief to -- a motion to vacate

24    attachments and dismiss.  So --

25         MR. QUARTARO:  Movants first, Your Honor?

1              THE COURT:  Yes.

2              MR. QUARTARO:  Thank you.  And shall I take the

3    lectern, is that --

4              THE COURT:  That works.

5              MR. QUARTARO:  Okay, thank you.

6              THE COURT:  Could you wait one just -- just one

7    second?

8              MR. QUARTARO:  Sure.

9              THE COURT:  Go ahead.

10             MR. QUARTARO:  Thank you, Your Honor.  First, let me

11   thank the Court for both the courtesy of allowing us to appear

12   and granting our pro hac applications.  Thank you, Your Honor.

13   And second, of course, the extraordinarily quick hearing that

14   Your Honor has granted to the Advantage Defendants in this

15   case.  It's greatly appreciated.  The vessel that is under

16   arrest is costing approximately $25,000 a day to its owner,

17   and so the Court's prompt attention to this request is

18   appreciated, so thank you for that.

19        As Your Honor will probably appreciate from the papers

20   that we filed with the Court, today's hearing, at least a

21   portion of it, is somewhat Groundhog-Day-like for counsel.

22   The issues that are raised, particularly with respect to the

23   Advantage Defendants, and we should at the outset identify the

24   fact that there are two separate groups of Defendants, the

25   Geden parties, and in the caption, Your Honor, that would

1    appear to be Space Shipping and Genel Denizcilik Nakliyati A S

2    -- and I don't speak Turkish, so I'm sure I butchered that in

3    Turkish, but a/k/a Geden lines, and Mehmet Emin Karamehmet,

4    three named Defendants in this action are on the Geden side.

5            THE COURT:  Mehmet is part of the -- Mr. Mehmet is

6    part of the Geden side?

7            MR. QUARTARO:  There are two Mehmets mentioned, Your

8    Honor.

9            THE COURT:  Right.

10           MR. QUARTARO:  There is a Mehmet Emin Karamehmet,

11   who is --

12           THE COURT:  Yes.

13           MR. QUARTARO:  -- who Plaintiff alleges is the

14   ultimate beneficial owner of the Geden side of the fence, and

15   we'll get to that because there are some curve balls in there

16   that are important.  And there is a Mehmet Met, who is an

17   employee of the Advantage Defendants.  So there is a Mehmet --

18   Karamehmet, who is alleged to be the owner on the Geden side,

19   and then there is a CFO, Mehmet Met, who is also one of the

20   witnesses that was deposed --

21           THE COURT:  But who are the Defendants on the Geden

22   side?  It's --

23           MR. QUARTARO:  Mehmet Emin Karamehmet.

24           THE COURT:  Okay.

25           MR. QUARTARO:  Space Shipping.

1              THE COURT:  Okay.

2              MR. QUARTARO:  And Genel Denizcilik Nakliyati A S,

3      a/k/a Geden Lines.

4              THE COURT:  Okay, and Gulsun Karamehmet is on the

5      Advantage side, or --

6              MR. QUARTARO:  Yes, Ma'am.

7              THE COURT:  Okay.

8              MR. QUARTARO:  And then, of course, the rest of the

9      Defendants.  And just to -- for clarity I'll list them out:

10     Advantage Avenue Shipping, Advantage Tankers, Advantage

11     Holdings, Forward Holdings, and the owner -- 85% owner of

12     Forward Holdings, Gulsun Nazli Karamehmet Williams.  So that's

13     the division in the Defendants.  And just for clarity -- and

14     we've referred to them in our papers.  And if Your Honor is

15     comfortable with it, I'll just use the defined term the

16     Advantage Defendants, and that encompasses our clients and who

17     we represent here --

18             THE COURT:  Okay.

19             MR. QUARTARO:  -- here today.  And I'll also just

20     apologize, I have a small tooth issue which is giving me dry

21     mouth, so I may be sipping water a little more frequently than

22     I usually would.  Okay, so the Groundhog Day nature of this

23     case is sort of our first argument in the papers, Your Honor.

24     And just as we get to that, I think it's important to note,

25     and it's in Plaintiff's complaint, there is a underlying

1    arbitration apparently going in England between this Plaintiff

2    and Space Shipping.  There may be some of the other Geden

3    parties involved.  Many of the facts that are listed in

4    Plaintiff's suggested material facts, findings of material

5    fact, would seem to pertain to that arbitration.

6         THE COURT:  Well, so the arbitration is, with

7    respect to the MITCV Stealth, and it's really about the

8    charter issue rather than the security issue, correct?

9         MR. QUARTARO:  That's my understanding, yes.

10        THE COURT:  Okay.

11        MR. QUARTARO:  Yes, the Advantage Defendants are not

12   a party to that arbitration.  So the Plaintiff Psara Energy --

13   and I'll just go through our three primary arguments, I think,

14   is probably the best way to do it -- sued the Advantage

15   Defendants with one minor difference, and to appreciate that

16   difference, we should probably, if Your Honor has it handy,

17   turn to, I believe, Exhibit-5 of Plaintiff's verified

18   complaint.  I have one handy if Your Honor is --

19        THE COURT:  I have it.

20        MR. QUARTARO:  And that should be an organization

21   chart.

22        THE COURT:  Yes.

23        MR. QUARTARO:  Now you can see, and Your Honor is

24   doubtless familiar with this, if not from previous shipping

25   cases, from real estate cases, vessels are very often owned in

1    an ownership structure similar to real estate in that there

2    are a number of holding companies and then special purpose

3    companies that hang under each one of which will own an asset.

4    And that's exactly how this entity is organized.  And you can

5    see at the bottom there is a list of, I believe, 11 of these

6    special purpose companies.  Each one of them is a vessel

7    owner.  All Plaintiff has done here that is different from its

8    action in Texas is put a different SPV in as a Defendant.  And

9    I think that's a very important factor as we go forward.

10              THE COURT:  So in Philadelphia it's the Advantage

11   Avenue, and in Texas it's the Advantage Arrow.

12              MR. QUARTARO:  That's correct.

13              THE COURT:  Okay.

14              MR. QUARTARO:  So they sued down in Texas, they

15   grabbed one of the Advantage ships.  We moved to vacate

16   Plaintiffs, including Psara Energy, resisted that partially on

17   the grounds that they claimed discovery would allow them to

18   prove their claims.  We went forward.  We had discovery, Your

19   Honor.  We provided three witnesses who were deposed over the

20   course of a number of days in London, England.  We produced

21   5,000 odd pages of documents, including third party court --

22   or third party banking records and things of that nature.

23   Plaintiff served a third party subpoena on CIT, the arm of the

24   bank.  We deposed Ms. Bacha, who is here today, and we went

25   forward and had a evidentiary hearing over a course of a

1    number of hours before Magistrate Judge Stacy in the Southern

2    District of Texas.  We subsequently provided some additional

3    briefing at the Court's request.  Magistrate Judge Stacy was

4    obviously fully seized of the case and issued the report and

5    recommendation which Your Honor will see annexed to our

6    statement of proposed material facts, I believe, at Exhibit-6.

7    The -- and we refer to that in our papers as the report, and

8    if Your Honor is comfortable with that, I'll just use that

9    shorthand for the report.  A reading of the report, Your

10   Honor, is devastating to Plaintiff's case.  It reveals that

11   Magistrate Judge Stacy has determined, after this hearing,

12   after these depositions, after a full consideration of the

13   evidence and the arguments and multiple rounds of briefing,

14   that Plaintiff has no case, no substantive claim against the

15   Advantage Defendants.

16             THE COURT:  And by Plaintiff you mean Psara Energy?

17             MR. QUARTARO:  Yes, there was actually three --

18   there were three Plaintiffs that filed in Texas, Psara, Tank

19   Punk, and I forget the name of the other one.  It's listed in

20   our papers and they're defined as the Texas Plaintiffs.

21   Eclipse Liquidity, Your Honor.

22             THE COURT:  So in the Magistrate Judge's report and

23   recommendation, I understand that the -- prior to her -- him

24   or her?

25             MR. QUARTARO:  Her.

1          THE COURT:  -- her writing the report and

2    recommendation, the claims by Eclipse and Psara had been

3    resolved.

4          MR. QUARTARO:  No, I would say that the -- that

5    security had been provided up to a certain level in those two

6    cases.  But as you can see from the docket, which we've

7    annexed to our statement of facts as Exhibit-1, you can see

8    that all three of these parties, Eclipse, Psara, and Tank

9    Punk, are named as Plaintiffs.  None of them are off of the

10   docket.  And if you take a look through the docket, you can

11   see that there is no -- you know, no motion to dismiss, no

12   notice of withdrawal, nothing along those lines, Your Honor.

13         THE COURT:  Well, help me find this -- where is this

14   --

15         MR. QUARTARO:  I'm sorry, Your Honor --

16         THE COURT:  Where are they?

17         MR. QUARTARO:  -- this is Exhibit-1 to --

18         THE COURT:  Exhibit-1, okay.

19         MR. QUARTARO:  -- the Advantage Defendants'

20   statement of proposed material fact.

21         THE COURT:  Okay, let me see.

22         MR. QUARTARO:  I have an additional copy available

23   should the Court require it.

24         THE COURT:  It was filed -- I got it.

25         MR. QUARTARO:  To make it print I had to put it into

1    landscape format, so that might help, but it should be labeled

2    as Exhibit-1.

3         THE COURT:  Yes.  Well, the -- I'm looking at the

4    recommendation, and she refers in discussing the matter to

5    Plaintiff Tank Punk, and I thought I had seen something in

6    which her assumption, whether correct or incorrect, was the

7    matter had been resolved with respect to the other two

8    Plaintiffs.

9         MR. QUARTARO:  The security that those two

10   Plaintiffs sought was provided in that case.

11        THE COURT:  Okay.

12        MR. QUARTARO:  However, the request for discovery --

13   and maybe it's just cleanest to walk through that procedurally

14   right now.  The response to our motion to vacate was by Psara,

15   and we've included that reference in our papers, and you can

16   see it right on the docket itself.  The discovery that was

17   taken, and if you look at our statement of facts, Exhibit --

18        THE COURT:  I'm interested mostly in what happened,

19   you know, after the report and recommendation was issued, so

20   the --

21        MR. QUARTARO:  That may be --

22        THE COURT:  -- your representation is that on the

23   docket the objections were filed by Psara, even though --

24        MR. QUARTARO:  That's --

25        THE COURT:  Okay.

1           MR. QUARTARO:  That may be the quickest way, just

2    can we get to the bottom and we see they're still in the case.

3           THE COURT:  That's what I like to do, get to the

4    quickest way.

5           MR. QUARTARO:  So let's just quickly pop there.  I

6    believe that's the very last page of Exhibit-1, and it's

7    Docket entry 7, Your Honor.  Or, I'm sorry, 70 and 71.

8           THE COURT:  Okay, go ahead.

9           Mr. QUARTARO:  So you can see Docket Entry 70, and

10   this is as recently as July 20th, 2016.  Docket Entry 70, and

11   I'll just read it into the record here.  Objections to link

12   #64, memorandum and recommendations filed by Eclipse

13   Liquidity, Inc., Psara Energy Limited, Tank Punk, Inc.  The

14   next docket entry is 71.  It reads almost exactly the same and

15   it's a response to Docket Entry 69, which is the Advantage

16   Defendants objections to the memorandum and recommendations.

17           THE COURT:  Okay.

18           MR. QUARTARO:  And so you can see as clearly as July

19   20, the second to last and the one before that, docket entries

20   in Texas, Psara Energy is still appearing in filing papers.

21   Objections, in fact, to the report and recommendation that's

22   before Your Honor.

23           THE COURT:  Okay.

24           MR. QUARTARO:  There was a bit of a procedural

25   morass here, which Psara and Tank Punk caused by trying to

1   file -- I forget what they called it.  It's referred to in the

2   report and recommendation, a corrected complaint or something.

3   The Court ultimately directed them to enter a proposed amended

4   complaint because there were certain relation back issues that

5   were present in that argument.  So there was a little bit of a

6   procedural jumble there.  But I think the salient point, and I

7   think Your Honor is absolutely right to focus on it, is that

8   the last things that were filed in Texas by the Plaintiffs in

9   that action were explicitly filed by Psara.  So they can't

10  really say that they're somehow out of the Texas action.

11          THE COURT:  Well, I'm just -- I mean, I'm listening

12  to what you're saying, but I'm also reading the holding in the

13  report and recommendation with respect to the dominion and

14  control prong, and it says Tank Punk's evidence of control,

15  which is predicated primarily on the familial relationship

16  between Karamehmet and Williams, and secondarily on the

17  charter business with Shel Westin the Advantage Defendants

18  retain following their purchase of the 11 tankers is simply

19  insufficient under a preponderance of the evidence standard to

20  meet the dominion and control prong of the alter ego test.  So

21  her -- regardless of the procedural niceties of the situation,

22  the Magistrate Judge believed that she was writing solely with

23  respect to Tank Punk when analyzing the dominion and control

24  prong.  At least that's what it appears to me in reading the

25  opinion.

1          MR. QUARTARO:  I understand.  However, I think it

2     should be noticed and understood that Psara, Tank Punk and

3     Eclipse are all special purpose vehicles hanging under --

4     they're all part of the same group with the same claims --

5          THE COURT:  I understand that you say that, I got

6     it, yes.

7          MR. QUARTARO:  -- and all of the discovery in that

8     case, and just to get to the last piece of evidence on that,

9     which is our Exhibit-5, all of the discovery in that case was

10    explicitly taken by, among the other Texas Plaintiffs, Psara.

11    So when you go, for example, to the first page of Exhibit-5,

12    which is the deposition record from Mr. Telgus, who is one of

13    the three witnesses that they deposed, you could see that the

14    case caption includes Psara Energy, and you can see that Mr.

15    Gaitas, who is present here today, introduces himself by

16    saying I am George Gaitas, the attorney for the Plaintiffs in

17    this case.  So they -- and if we look at Exhibit-4, which are

18    the notices of deposition and subpoenas that were served, you

19    can see that all -- that the three subpoenas and the three

20    notices of deposition all are served under the caption

21    including Psara, and all reference Plaintiffs Psara Energy and

22    Tank Punk, to take those depositions.  So Psara took that

23    discovery.  Psara participated in that.  Psara remains on the

24    docket in Texas.

25          THE COURT:  Okay, move on.

1           MR. QUARTARO:  Okay, so thank you.  Thank you, Your
2   Honor.  Okay, so our -- and that's kind of the Groundhog Day
3   nature of this whole case for us.  And it might actually be
4   helpful just as we do this, for me to very quickly -- and your
5   clerk was kind enough to bring an easel.  And if Your Honor
6   will indulge me -- thank you.  I think -- and I'll try and --
7   I've never been accused of having an indoor voice.  I'll try
8   and make sure that I'm recorded here.  But from what we can
9   see, what we have here really is our Plaintiff who's alleging
10  a charter contract with Space -- sorry about that -- and is
11  alleging that Space is owned by Geden Holdings.
12          THE COURT:  Don't they allege that -- well, okay.
13          MR. QUARTARO:  I believe it's paragraph 27 of the
14  verified complaint, Your Honor --
15          THE COURT:  Okay.
16          MR. QUARTARO:  -- that makes that allegation.
17          THE COURT:  Okay.
18          MR. QUARTARO:  And then we've got -- I'll just put M
19  and K, if that's okay.  And then we get over to the Advantage
20  side here and we've got Nazli Williams and then Forward and
21  then the next one is Advantage Holdings, the next one is
22  tankers.  I can see, Your Honor, I would not have succeeded as
23  a school teacher.  And then under this is Avenue, right,
24  Advantage Avenue.  And under this is the oil tanker that we
25  have restrained.

1          THE COURT:  Okay.  I mean, I've read the Magistrate

2     Judge's report and also the complaint, so I'm not sure where I

3     got this particular piece of information.  It might be

4     relevant moving on, but as I understand it, the -- Space --

5     there's a distinction between Geden Holdings and Genel D.

6     Nakliyati.

7          MR. QUARTARO:  Absolutely.

8          THE COURT:  And the Geden Holdings is the owner, but

9     Nakliyati is the manager, and the relationship with the --

10    with Forward and -- and that Forward and Advantage Arrow have

11    relationship -- management relationships with Genel.

12         MR. QUARTARO:  That's correct, yes.

13         THE COURT:  Okay, so it's not quite as simplified as

14    you have on the left.

15         MR. QUARTARO:  There is a management company --

16         THE COURT:  Yes.

17         MR. QUARTARO:  -- that's involved --

18         THE COURT:  Yes.

19         MR. QUARTARO:  -- that's true, but it is not alleged

20    anywhere in these papers to have an ownership interest.

21         THE COURT:  Okay.

22         MR. QUARTARO:  That's critical.

23         THE COURT:  Okay.

24         MR. QUARTARO:  Also, and this -- you know, this is

25    kind of the problem with the case, is that to the extent there

1    is anything new that's being argued here, the only thing

2    that's new is the substitution of Advantage Avenue instead of

3    one of the other SPVs.  So this relationship, at least up to

4    here, is what's been litigated in Texas.  They've just swapped

5    in a different SPV that owns a different ship here in

6    Philadelphia, Your Honor.  That's the only structural

7    difference in this case, and I think that's absolutely

8    critical for looking at the collateral estoppel issue.

9             THE COURT:  Well, there's -- so this case is only

10   Psara, not Eclipse and not Tank Punk, so that's --

11            MR. QUARTARO:  Well, yes, that's true, but the --

12   it's a consolidated docket.  And so Psara filed its own

13   action, Tank Punk filed its own action, Eclipse filed its own

14   action, and the Court consolidated them into it.

15            THE COURT:  Ah, okay.  So -- okay.

16            MR. QUARTARO:  So they're all stand-alone

17   complaints, yes.

18            THE COURT:  So, okay, let's just focus on the Psara

19   case, then, and Psara -- I'm just -- and forgive me, this is a

20   complicated case --

21            MR. QUARtARO:  I understand.

22            THE COURT:  -- and I'm trying to really get to the

23   bottom of it here.  So if we look at the Defendants, Space

24   Shipping, both Pennsylvania and Texas, but Advantage Avenue

25   Shipping only in Pennsylvania, that's because you said they

1    changed the ship.  Geden Lines --

2              MR. QUARTARO:  Geden Lines is present in both, Your

3    Honor.

4              THE COURT:  Is both.  No --

5              MR. QUARTARO:  Yes, Geden lines is present in both.

6              THE COURT:  Pennsylvania and Texas.

7              MR. QUARTARO:  Yeah.

8              THE COURT:  Advantage Tankers, LLC, present in both;

9    Advantage Holding, LLC, present in both; Mehmet Karamehmet in

10   both; Gulsun Karamehmet Williams, both; Aver Navigations, only

11   Texas; Advantage Arrow Shipping, only Texas; Forward Holdings,

12   LLC, both; Spike Shipping, only Texas.  Now the ones that are

13   only Texas, does that make a difference to your argument that

14   the parties are the same?

15             MR. QUARTARO:  It does not, because each one of

16   those differences that Your Honor has found, if you look at

17   that org chart that is that Exhibit-5, there's simply

18   different SPVs -- and this is Plaintiff's document, too,

19   right.  This isn't even us, this is the Plaintiff alleging the

20   corporate structure.  But I think they have it largely

21   correct.  There are just different ship owning companies

22   hanging under Advantage Tankers.

23             THE COURT:  But isn't one of your arguments that the

24   corporate veil can't be pierced, but yet you're telling me

25   that, oh, it's just a different -- it's a different company

1    for each ship.  So -- and you're throwing them together into

2    one pot.  Is that problematic?

3          MR. QUARTARO:  For the purposes of the legal

4    analysis, it is not, and the reason it is not is because these

5    other Defendants that are in Texas are -- you know,

6    organizationally, they sort of hang like this.  So all they've

7    done -- remember, this is just a we've-found-an-asset-

8    belonging-to-the-Defendant-and-we've-grabbed-it case.  So here

9    they found an -- they found the Avenue.  In Texas they found

10   the Arrow.  In Louisiana they got a different ship.

11         THE COURT:  So you're telling me for -- at least

12   from your perspectives, it doesn't matter whether it is

13   Advantage Avenue, Advantage Arrow, Advantage whatever, it's

14   the same thing?

15         MR. QUARTARO:  Right.

16         THE COURT:  And how do I --

17         MR. QUARTARO:  Yes.

18         THE COURT:  -- how do I know that for the -- apart

19   from you telling me, and you're an officer of the Court, I

20   assume you're telling me the truth --

21         MR. QUARTARO:  Of course.

22         THE COURT:  -- but I think I need more than that.

23         MR. QUARTARO:  Of course, Your Honor.  I would say

24   that it doesn't matter, because if they -- what they would

25   need to prove up here is this chain of all three ego

1    relations, right?  So their in privity was faced, so they've

2    got a -- and we'll -- there was another lurking problem that

3    we'll get to at the end.  But they've got to pierce the veil

4    from Space up to its owner, right.  That would be the first

5    thing.  So that's old things.  They've got to pierce the veil

6    up to its owner.  Then they've got to get across to Ms.

7    Williams.  Then they've got to get down to Forward, down to

8    Advantage Holdings, and down to Advantage Tankers.  By

9    substituting a different SPV, our view, they don't get to

10   relitigate this entire chain.  Now granted, granted, Your

11   Honor, if they had gotten to the point where they had found

12   liability, up to the -- or they had found an alter ego chain

13   and been able to prove that, up to the Advantage Tankers

14   level, then all they would need to do is show the same 3rd

15   Circuit veil piercing factors that they would presumably have

16   been able to show, and they could have gotten any of these

17   SPVs.  But there is no allegation like that in the complaint,

18   Your Honor.  There is no allegation that says, oh, we have new

19   facts that show that the Advantage Avenue was somehow treated

20   differently than any of the other SPVs in Texas.  And that's a

21   critical collateral estoppel problem for them, because this

22   chain of relationships has been fully litigated.  We've got

23   discovery, we've got depositions, we've got a reasoned report

24   and recommendation from the Magistrate.

25              THE COURT:  Well, let's talk about that.  You

1    premised your last couple of sentences with 3rd Circuit veil

2    piercing law.  But I'm looking at the report and

3    recommendation, and obviously they're in Texas, so I see a lot

4    of 5th Circuit, and some other cites to other cases -- other

5    circuits, presumably, because the 5th Circuit didn't have

6    specific cases on that point.  But wouldn't the substantive

7    law be different in that I would be dealing with the 3rd

8    Circuit law and the Magistrate Judge was dealing with the 5th

9    Circuit law?

10            MR. QUARTARO:  I think there is two answers to that

11   question, but the first answer is yes, absolutely.  This is

12   the 3rd Circuit; we have different law than we have in the

13   5th.

14            THE COURT:  So all things being considered, why

15   would I -- why would the Magistrate's report and

16   recommendation on that particular point, why would I -- why

17   would it collaterally estop -- be collaterally estopped -- why

18   could it be used as collateral estoppel in this case?  Only on

19   that substantive law issue.

20            MR. QUARTARO:  Well, because that issue has been

21   fully and fairly litigated in Texas, Your Honor.  Put it --

22   you know, to look at it another way, how can one bring a case

23   for breach of contract in Texas, get a report and

24   recommendation like this, throwing that -- basically throwing

25   it out, and then look at New York and go, actually, there is a

1    slightly different contract law in New York.  We'll sue them

2    in New York; we get to re-litigate the whole thing.  That

3    doesn't make sense.  How many times did they get to run that

4    argument?  Do they get to move from the 5th Circuit to the

5    3rd, to the 2nd, to the 1st until --

6            THE COURT:  Well, let's say they had won that

7    argument, and let's say -- what was the ship there?  The --

8            MR. QUARTARO:  There were --

9            THE COURT:  The Arrow.

10           MR. QUARTARO:  Yes, there were a couple of them, but

11   the Arrow is one.

12           THE COURT:  You know, let's say the Magistrate Judge

13   had said, yes, with respect to the Arrow, impounding is

14   proper, and they were to go with respect to all of the other

15   ships, all of those LLCs down at the bottom, and they were to

16   go to every single court across the Country, wherever they

17   could find a ship, and say to the Judge, well, you know, the

18   Magistrate Judge said that, so therefore we don't even have to

19   litigate it.  Would you be okay with that?

20           MR. QUARTARO:  I would say that would be a daunting

21   case of offensive collateral estoppel.  That would be a

22   difficult argument to overcome.

23           THE COURT:  But it's different for you?

24           MR. QUARTARO:  No, that's exactly the same.  It's

25   collateral estoppel on the defensive side because they've

1    brought the action here.  It's a mirror image of the same

2    thing.  I would have a problem with that.  If that had

3    occurred, how could I appear before Your Honor and say, well,

4    even though they proved that Emin Karamehmet and Geden

5    Holdings were alter egos in Texas, that's not binding on me

6    here in the 3rd Circuit.  I would be laughed out of the

7    courtroom.  I mean, of course it's binding on us.  It's been

8    fully and fairly litigated, the issue has been advanced,

9    discovery has been had, a decision has been issued.  How could

10   I possibly use defensive collateral estoppel in that instance?

11   I would really be on the other side and it would be Plaintiffs

12   using that offensively.  But if the issue is fully and fairly

13   litigated before a court, you can't just go to another court

14   because you think the law might be a little bit different

15   there, and retry the case.  I mean, how many sort of kicks at

16   the can does one get?  I would suggest that it's one, Your

17   Honor.

18            THE COURT:  Okay, continue.

19            MR. QUARTARO:  Okay, thank you.  Thank you, Your

20   Honor.  So just walking through the collateral estoppel issue,

21   I think there is really only two issues.  1) Can a different -

22   - you know, can different SPVs owned by Plaintiff bring a

23   series of cases against the different SPVs owned by the

24   Advantage Defendants, or not?  And I think the answer to that

25   is no, because otherwise they get to bring 11 lawsuits.  Every

1    time they get one of these ships somewhere, they get to start

2    the whole thing over again because they've moved one different

3    party head.  As Your Honor is doubtless aware with collateral

4    estoppel, the issue is not necessarily uniformity of the

5    parties, it is privity.  And in this case both companies are

6    organized roughly the same way.  They've got a series of these

7    ship owning companies hanging under a holding company, a hold

8    co, and of course they've got three or four of them that are

9    in privity with different Geden Holdings companies.  And so

10   this would also set up a problem where they could just go from

11   SPV to SPV, having the same lawsuit over and over and over

12   again, simply by subbing in a different Advantage SPV.  That

13   can't work either.  They're in privity, they're part of the

14   same corporate group.  They shouldn't get to litigate this

15   infinitely.  And in any event, even if they're making that

16   argument, these relationships, at least again up to Advantage

17   Tankers, are all the subject of the action in Texas.  So as

18   findings of fact and findings of law go, we -- you know, we

19   have the report, it's under consideration, of course, by the

20   District Court, and you can see from that report that these

21   relationships have been fully explored.  It's not like the

22   Judge somehow didn't look at them.  She looked at them in

23   great detail.

24            THE COURT:  So let's talk about the fact that it's

25   awaiting a decision by a District Court.  So you -- the

1    objections were filed, responses were filed, replies were

2    filed, so it was ripe on August the 11th, 2016.

3            MR. QUARTARO:  That's correct.

4            THE COURT:  And I don't know what the docket is like

5    in Texas, I don't, like, know whether they do it immediately

6    or wait for six months, I have no idea.  But certainly there's

7    de novo review.  And given that, what does that do to your

8    collateral estoppel argument?

9            MR. QUARTARO:  I think the issue that Your Honor is

10   touching on in -- with respect to collateral estoppel is found

11   in the restatement second and that's the requirement 30

12   finality.  I think that's probably -- would you agree?

13           THE COURT:  I would -- that's -- to put a fine point

14   on it, yes.

15           MR. QUARTARO:  Yes, okay.  Well, I used that word

16   specifically because, of course, I familiarized myself with

17   the status of -- with the requirement that a judgment be final

18   here in the 3rd Circuit.  And what we've learned, and we have

19   this on page 7 of our brief, is that -- and we could quickly

20   read it into the record because it may be helpful, and we've

21   quoted In RE: Brown, a 3rd Circuit case from 1991, and that's

22   951 F2d 564 at page 569.  In the collateral estoppel --

23   finality in the collateral estoppel context is a more pliant

24   concept than it would be in other concepts -- other contexts,

25   I'm sorry, and finality may mean little more than the

1    litigation of a particular issue has reached such a stage that
2    a court sees really no good reason for permitting it to be
3    litigated again.  I would suggest that that is precisely where
4    we are.  We have a report and recommendation that is pending.
5    It has resolved all of these alter ego allegations that have
6    been made by Plaintiff.  It is awaiting a review by the
7    District Court.  It's been fully submitted; well, the
8    responses and all of that are in and before the Court.  And I
9    would suggest that in the interim, between the issuance of
10   that Magistrate report and recommendation and the District
11   Court's decision, we have sufficient finality at least to, you
12   know, to say that it's not fair during that window to run out
13   on the very same theory that the Magistrate Judge has fully
14   tried and rejected, and go grab additional assets, in this
15   case $3.5 million, probably a $4 million bond is what's being
16   requested.
17           THE COURT:  Well, I mean, you're beating the
18   fairness drum.  But, you know, certainly if someone were to
19   get up in this District and say to me, while a Social Security
20   appeal, report and recommendation, or a habeas recommendation
21   by a Magistrate Judge should be -- is to all intents and
22   purposes final, I know that most of the judges in this
23   courthouse would be a little bit upset, because we routinely
24   review habeas R&Rs, and social security R&Rs, and pretty much
25   any R&R, and I think it's our job to do that.  So, you know, I

1  understand that you're hanging your hat on the fairness, but

2  it's also not fair to them if I use what is, in essence, a

3  report and recommendation, not a decision, not an opinion, to

4  grant you a victory in this case.

5       MR. QUARTARO:  I understand.  And before Your Honor

6  continues, I would just be very, very clear:  I am not

7  suggesting in any way, shape or form that a R&R, or the report

8  in this case is equivalent to a judgment in all contexts.

9  What I am suggesting is that 3rd Circuit precedent says that

10 in the collateral estoppel context, the concept of finality is

11 a little bit more amorphous than that, for example, that you

12 might see in -- you know, in other contexts.  I certainly --

13 that is -- a report and recommendation is not the equivalent

14 of a judgment.  We'll be absolutely clear about that, and I

15 expect that the District Court is undergoing the review of the

16 underlying papers, the R&R, and the other documents that it

17 would undertake in the normal course.  What I am suggesting is

18 that for collateral estoppel purposes, that In RE: Brown, and

19 there is an accompanying 3rd Circuit case that it cites,

20 Dyndul v. Dyndul, says that it's a little bit more pliant than

21 what we would have in other contexts.  And I would argue to

22 the Court that in this case -- excuse me -- the Magistrate

23 having heard everything, the -- you know, having had the

24 testimony and everything before her, the documents, counsel

25 arguing, and having issued not a 1½-page, you know, short

1    decision, a 25-page lengthy, reasoned decision that for the

2    purposes of this suit under 3rd Circuit precedent, we have a

3    sufficiently final judgment that Plaintiff ought to be

4    collaterally estopped from bringing the very same alter ego

5    claims that it has litigated in Texas.  And on top of that, I

6    would have to say that that report, it's not -- it doesn't

7    present Plaintiff's claims as a close call.  It's rather

8    clear, there's no substantive claim against the Advantage

9    Defendants.  That's one of the Court's conclusions.  So this

10   isn't sort of a halfway analysis.  She went the full distance

11   and issued a, you know, fairly lengthy report examining really

12   all of the same allegations that are before Your Honor with

13   respect to the alter ego allegations.

14           THE COURT:  Now, <u>In RE: Brown</u>, was it -- or is it

15   <u>Dyndul v. Dyndul</u>, are either of those cases in the context of

16   an R&R?

17           MR. QUARTARO:  I don't believe so, no.

18           THE COURT:  Okay.  Have you found any cases in the

19   context of an R&R anywhere in the country with respect to this

20   issue?

21           MR. QUARTARO:  I don't think I could represent to

22   the Court that we did a national search on it, and having put

23   this together in sort of 48 hours, I don't frankly recall what

24   I saw in that context.

25           THE COURT:  Presumably you looked to the Eastern

1    District of Pennsylvania.

2            MR. QUARTARO:  Well, of course, Your Honor, and 3rd

3    Circuit.

4            THE COURT:  Anything in the Eastern District of

5    Pennsylvania?

6            MR. QUARTARO:  Not that I recall, Your Honor.

7            THE COURT:  Middle District?  Western District?

8            MR. QUARTARO:  Not that I recall, Your Honor.

9            THE COURT:  New Jersey, Delaware?

10           MR. QUARTARO:  I believe the -- I believe Dyndul v.

11   Dyndul may have been a New Jersey case, but I don't -- I just

12   don't recall what the underlying piece was there.  I'm sorry,

13   Your Honor.

14           THE COURT:  Okay.  Move on.

15           MR. QUARTARO:  So that we think is -- frankly, we

16   think that's a pretty major problem with Plaintiff's

17   complaint.  We're also, you know, seized of a number of other

18   arguments.  One of them -- I'll return to this in a moment.

19   Did Your Honor have any further questions on the collateral

20   estoppel, or --

21           THE COURT:  Not the collateral estoppel argument,

22   no.

23           MR. QUARTARO:  Okay.  So I think it probably makes

24   sense then, we'll move on to the next piece.  Just as I do

25   that, though, I do want to flag that should Plaintiff's

1    proposed findings of fact be adopted, it actually sets up a

2    fascinating collateral estoppel down in Texas, because of

3    course they could take Your Honor's order, trot down to Judge

4    Werlein, and say, well, to the extent you're debating whether

5    or not to adopt the factual findings of the Magistrate, on a

6    couple of instances it's too late, because the Eastern

7    District of Pennsylvania has given us an actual order, and so

8    Your Honor is now precluded.  They could use that as offensive

9    collateral estoppel.  You know, it would depend on which

10   factual allegation, as you saw from their statement of

11   proposed material facts, some of them go to the arbitration,

12   some of them would be relevant in Texas, some of them are

13   probably only relevant in the case before Your Honor.  But the

14   commonality of facts means that that issue -- that order could

15   have -- should Your Honor order it, could have a preclusive

16   effect down in Texas.  I think that's especially problematic

17   where here we have a rule E hearing, there we've had an

18   evidentiary hearing with discovery, argument, briefing, and

19   all of that.  So I -- to finish on the collateral estoppel

20   issue, it sets up an interesting collateral estoppel issue

21   should their relief be granted.  I would make the same

22   observation about the statements of fact that they proposed to

23   Your Honor with respect to the arbitration in England.

24   Although we're not a party to it, it would seem that would

25   have the same effect.  They could then go to England and say,

1     oh, litigated this issue, so they don't get to bring it up

2     now.  I'm not sure procedurally really how that would work.

3     I've never been confronted with that one before.

4          Moving on to the allegations of their complaint, we've

5     got another reason why Your Honor can vacate this attachment.

6     The first -- you know, the first thing that I would observe to

7     Your Honor is that this is a very unusual series of

8     allegations.  We're not faced with the normal case where we

9     have a owner of a company who has blurred the lines between

10    their personal finances and the company and were attempting to

11    treat that owner and the company as alter egos of each other.

12    It would just be a much more common sort of allegation.  We're

13    off in whatever we want to call this extended chain of alleged

14    alter egos.  And so it is an unusual and unorthodox theory, I

15    would say one that there is very, very little precedent on.

16    And with respect to the 3rd Circuit, that raises some

17    problems.  I think, you know, the first problem is that we

18    have these factors that the 3rd -- for piercing the corporate

19    veil, bearing in mind that under general Maritime law, we have

20    some authority that really reserves veil piercing for an

21    extraordinary circumstance.  And I'm not clear that an

22    extraordinary circumstance has been alleged here.  But the

23    other standard that the 3rd Circuit has enunciated, and we

24    have this from the Pearson case, which I think is a good

25    guide, is that in a corporate veil piercing case, this burden

1    is very difficult for a Plaintiff to meet, and for obvious

2    reasons.

3            THE COURT:  But the burden is different than in

4    Texas, right?

5            MR. QUARTARO:  The -- I would say that -- I think

6    the burden is the same and we are in the same posture of a

7    rule E hearing.  So I think the evidentiary burden that the

8    Plaintiff had to bring in Texas and the evidentiary burden

9    that they would have to bring before Your Honor would have at

10   least initially been the same.  I believe in Texas, actually,

11   their burden then was elevated because we had discovery.  So

12   at that point we had a hearing that was beyond simply do I

13   have a prima facie case; it was much more akin to a mini-trial

14   on the issue.  That -- I think that's very important.  Their

15   standard in Texas was higher because we'd had this discovery,

16   they'd had the benefit of that.  So it wasn't get the

17   documents, get the testimony, oh, and then we only have to

18   make a prima facie case; it's we've got to meet it, I believe

19   the standard she applied was a preponderance.

20           THE COURT:  Well, let's compare apples to apples.

21   If you compare the 3rd Circuit standard to the 5th Circuit

22   standard at this stage of the proceedings and then compare it

23   following discovery at an evidentiary hearing --

24           MR. QUARTARO:  Identical.

25           THE COURT:  Identical.

1           MR. QUARTARO:  Identical.

2           THE COURT:  So it's identical after the evidentiary

3    hearing, but different at this stage?

4           MR. QUARTARO:  Yes, because we're here at a rule E

5    without any discovery or anything like that.  And so I think

6    the standard here is probably, as Your Honor suggested in the

7    order, is prima facie.  Should we somehow go forward, there's

8    discovery and all of those things, the standard obviously

9    would be higher because you would have the evidence before

10   Your Honor, you'd be able to determine --

11          THE COURT:  But the standard in Texas and the

12   standard in -- or in the 5th Circuit and the standard in the

13   3rd Circuit, you're making that representation it's exactly

14   the same standard?

15          MR. QUARTARO:  Yes, Your Honor.  I would say that at

16   an initial rule E hearing in both the 5th Circuit and the 3rd

17   Circuit, the Plaintiff's obligation would be to establish a

18   prima facie case showing sort of the order to show cause

19   standard, order to show cause why you have a prima facie case

20   and the attachment should not be vacated.  I would say that's

21   sort of what Aqua Stolee and the other cases that are before

22   Your Honor say, and indeed, that's what Your Honor's order

23   said, and I think that's correct.  However, if one goes

24   forward and obtains discovery and you litigate that issue,

25   obviously the standard is no longer prima facie, you have to

1    make your case.  You've got the evidence, you've explored it,

2    you've moved beyond the initial hearing.  And that's where I

3    would say it's exactly the same.  If we were both -- you know,

4    if we were here or in the 5th Circuit on the initial rule E,

5    it's a prima facie.  If we go forward, there's discovery and

6    things like that, it's got to be higher than prima facie.

7    What's the point of having the discovery?

8              THE COURT:  Well, there are some cases cited by

9    Plaintiff on page 3 of its brief suggesting that the Courts

10   are not uniform in what the standard is.  It's page 3, it's

11   the last paragraph, or the second -- well, it starts off by

12   saying the burden of proof in Rule E-4F is set out in the

13   text.  Plaintiff shall be required to show why the

14   (indiscern.) shall not be vacated or other relief granted

15   consistent with the rules.  And then the final paragraph says

16   that the standards are either a reasonable belief standard of

17   proof, and that's a 4th Circuit case, and then a reasonable

18   grounds standard, and that looks like New York and California,

19   and then a probable cause standard which seems to be Florida,

20   Louisiana, and Texas.  I don't see anything for the 3rd

21   Circuit.  But this suggests that in fact the standard is

22   different in different jurisdictions.

23             MR. QUARTARO:  I'm not sure, actually, in the Texas

24   case that that came up, because we didn't get an initial rule

25   E hearing.  What we got was an evidentiary hearing after

1    discovery.  So there was not the equivalent of the hearing

2    that we have before Your Honor.

3          THE COURT:  Right, but my question was, first of

4    all, at this stage, comparing apples and apples, is the

5    standard uniform, and I think you said yes.  And then I said

6    at the next stage, which is the evidentiary hearing following

7    discovery, is the standard the same, and you said yes, and I

8    don't think anyone's addressed that in any great detail, that

9    issue.  But the Plaintiff's brief does say that in this

10   context the standard does vary and, you know, to tell you the

11   truth, I don't know what the difference is between a

12   reasonable belief standard, a reasonable grounds standard, or

13   a probably cause standard in the context of this kind of

14   litigation.  But it does suggest that there is a different --

15         MR. QUARTARO:  I understand.  I --

16         THE COURT:  -- prism through which the Court views

17   the information it's receiving.

18         MR. QUARTARO:  I'm sorry, Your Honor?

19         THE COURT:  A different prism through which the

20   Court --

21         MR. QUARTARO:  Ah, yes, yes.  No, I can appreciate

22   that.  I think what I would probably say is that, again,

23   bearing in mind that we've got a difference between an initial

24   rule E and a post-discovery evidentiary hearing, whether or

25   not that's conducted personal to a rule E or not, I think

1   these terms are very close, you know, reasonable belief,

2   reasonable grounds.  These go -- these tests go to the grounds

3   upon which the Plaintiff has brought the attachment to action.

4   And again, I think in the context of this hearing, I don't

5   think that there is much dispute that that's probably a prima

6   facie standard.  I'm not sure that there is another lens that

7   Your Honor would apply at this stage of the proceeding.  I

8   think that should it move forward, that may very well become

9   an issue because then the question will be do -- how much of

10  their case do they need to make to Your Honor in order to

11  pierce the corporate veil.  And I would say at that point, you

12  know, we're moving into the normal civil preponderance of the

13  evidence type standard.

14          THE COURT:  With respect to your corporate veil

15  argument, is that ultimately a jurisdictional argument?

16          MR. QUARTARO:  It is a jurisdictional argument,

17  certainly.  It's also a substantive argument because without

18  being able to pierce that corporate veil, they can't go after

19  the Advantage Defendants' assets.  So it's certainly a

20  procedural issue and a -- which - -a jurisdictional issue.

21  But it's also a substantive issue.  If they cannot make that

22  corporate veil showing, that pierce the corporate veil

23  showing, then how can the Advantage Defendants have property

24  restrained in this district personally to their claim against

25  Space, and the answer of course would be that they can't.

1          THE COURT:  So your view is I have to decide that

2     issue in order to exercise jurisdiction?

3          MR. QUARTARO:  I think that -- that might flip it,

4     actually.  I think that if Your Honor -- and frankly, this

5     didn't come up in Texas so I'm reasoning through it now.  I

6     think if Your Honor was to vacate the attachment, then it

7     doesn't matter, right.  And if -- because the Advantage

8     Defendants are out.  If Your Honor was to uphold the

9     attachment, we have certainly reserved the jurisdictional

10     defense.  We've made a limited appearance under Federal Rule

11     E8, and I think that's something that we would then want to

12     look at and consider.  I'd have to really think about that,

13     Your Honor, because if you had found grounds to pierce the

14     corporate veil, I'm not quite sure how those grounds could be

15     -- would not be relevant to the jurisdictional finding.  As

16     I'm thinking about it, I'm thinking they would be.

17          THE COURT:  I think it's a complicated issue.

18          MR. QUARTARO:  Yes, and so --

19          THE COURT:  I don't think it's simple, no.

20          MR. QUARTARO:  -- that's -- as we say in the office,

21     that's a legal porcupine.  There's no way to wrestle with that

22     comfortably.  We'll see if the issue comes up.  I don't know

23     if it will.  It did not, again, in the Texas --

24          THE COURT:  Okay.

25          MR. QUARTARO:  -- action, but of course, at the rule

1    E -- the evidentiary hearing, the rule E evidentiary hearing

2    resulted in the R&R, so we never got there.

3              THE COURT:  Okay.

4              MR. QUARTARO:  So the -- does that square that

5    circle for the Court?

6              THE COURT:  That is.  Yes.

7              MR. QUARTARO:  Okay.

8              THE COURT:  You can move on to fraudulent conveyance

9    argument.

10             MR. QUARTARO:  Yes, thank you.  Thank you.  So --

11   and this actually -- Your Honor had asked about the standards,

12   and there is a divergence from standards here as well.  I

13   wouldn't say standards; factors in the test.  The 5th Circuit

14   has one test for corporate veil piercing.  The 3rd Circuit has

15   a different test.

16             THE COURT:  You mean fraudulent conveyance.  You

17   said corporate veil piercing.

18             MR. QUARTARO:  Yes, alter ego veil piercing.

19             THE COURT:  Okay.

20             MR. QUARTARO:  Yes, I'll cover off the other pieces

21   as well --

22             THE COURT:  Okay.

23             MR. QUARTARO:  -- because we have those as our next

24   arguments.  But the argument here, you know, the analysis

25   under Pearson of whether or not the corporate veil should be

1    pierced, has some slightly different factors than what the 5th

2    Circuit looks at. I would say in both cases there are

3    cautions in the case law that say these are non-exhaustive

4    lists. So I don't want to represent that, you know, this is

5    it, and Your Honor of course is free to look at other facts.

6    I'm not suggesting that's not the case. But these are, on the

7    list that Pearson instructs, are valuable things to look at in

8    determining whether the alter ego obligations ought to be

9    upheld. And when we look at the verified complaint, we can

10    see that these allegations are missing. And what are they?

11    Allegations that the Advantage Defendants, certainly -- I

12    don't know about the Geden Defendants, but the Advantage

13    Defendants are grossly undercapitalized, nothing. No

14    allegations that the Advantage Defendants failed to observe

15    corporate formalities. No allegations that they failed to pay

16    dividends or are insolvent. No allegations that the dominant

17    stockholder has siphoned funds from the alleged alter ego.

18    And that, again, of course, these tests reflect what Your

19    Honor would normally see in terms of alter ego allegations.

20    So it's not surprising that they're not there because it's an

21    unorthodox strategy or an unorthodox theory. The other ones

22    are whether or not the officers and directors serve a

23    function. There is on allegations that they do not, or that

24    the Advantage Defendants failed to keep corporate records.

25    And last, they do not and cannot allege that the Advantage

1    Defendants are a facade for the operations of the dominant

2    stockholder, because the dominant stockholder is different on

3    the Advantage side than on the Geden side.  So that's also an

4    allegation they can't quite, you know, get to.

5        So what do we have?  "Successor corporation

6    relationship," and I put that in quotes.  It's directly from

7    the complaint, and {quote} "fraudulent conveyance allegations"

8    {close quote}.  And they have problems here, too.  And the

9    first problem that they have is that successor liability in

10   the 3rd Circuit falls under a general rule that when one

11   corporation sells or transfers its assets -- and I think it's

12   also key here to note, Geden Lines had something like 65

13   ships.  We're talking about a subset of 11.  So we're not

14   talking about all assets, we're talking about one group of a

15   particular type of ship.  I think that's a pretty important

16   distinction.  This isn't a wholesale asset transfer from one

17   company to another, it's the sale of a portion, you know,

18   whatever that is, one-sixth odd of a fairly large fleet.  We

19   got into all of this in discovery, Your Honor.  They asked

20   questions of the CFO and the CEO and the owner and how did you

21   dispose of them and what was the -- you know, how was the

22   market price set independently by third party brokers, by the

23   way.  How were these vessels sold, the contracts were

24   produced, the banking records showing the payments were

25   produced, the release of the mortgage and how the purchasers,

1    the Advantage purchasers, paid off the mortgages.  All of

2    those bank records are in evidence, they were all produced,

3    they were litigated extensively.  So that chain of commerce,

4    Your Honor, is -- you know, the Texas court was fully

5    appraised of that.  We had charts showing what portion was

6    equity, what portion was debt.  You know, it was fully

7    litigated.  But under 3rd Circuit law they wind up with a

8    problem because, you know, we've got this general rule that --

9    and this is this Lafountain v. Webb Industries case, and it's

10   in our papers, 951 F2d 546 and 7 is the pinpoint.  The

11   successor -- one corporation sells or transfers its assets to

12   a second corporation, the successor does not become liable for

13   the debts and liabilities of its predecessor.  Now there is a

14   couple of exceptions.  Of course we've got product liability

15   cases, which isn't really what we're looking at here, but

16   that's one of the exceptions.  The other is found where

17   business is continued under another name.  But the 3rd Circuit

18   has addressed this.  And in Polius v. Clark Equipment, Co.,

19   and it cites to a 7th Circuit case, a continuation theory

20   demands a common identify of stock directors and stockholders

21   and the existence of only one corporation at the completion of

22   the transfer.  Here a simple examination of the docket reveals

23   that that is not the allegation that's before the Court.

24   We're not talking about a merger.  Their own allegations note

25   that there are different stockholders.  There's no allegations

1    that we've got a common identity of stock.  You know, they

2    don't -- there is obviously multiple companies, of course.

3    They don't meet that standard enunciated for a continuation

4    theory in the 3rd Circuit, and I think that's a problem with

5    that -- with arguing that theory.  I would also again point

6    out that this exact chain of relationships is exactly, at

7    least until we get to Advantage Avenue, is exactly what's

8    before the Court in Texas.  How are all of these ships sold?

9    What were the terms?  How were these companies formed?  When?

10   How were they capitalized?  This is what the Texas case is

11   about.  And what the Plaintiff is really trying to do is,

12   having had this report come out that's adverse to it, is

13   relitigate this.  They want to relitigate all of these issues

14   which are exactly the same issues that they litigated down in

15   Texas.

16            THE COURT:  Was the Louisiana case filed after the

17   Texas case?

18            MR. QUARTARO:  I believe so, yes.

19            THE COURT:  When?

20            MR. QUARTARO:  I would defer to Plaintiffs on that,

21   but my recollection is that one was filed in February or March

22   of this year.

23            THE COURT:  Do you know what's going on in that

24   case?

25            MR. QUARTARO:  It's just stayed.  And we put that

1   in, by the way, and actually, on the collateral estoppel

2   argument, that's a rather interesting comment that our

3   opponents have made.  If you look at Exhibit-7 to our proposed

4   statement of facts, there is a proposed stay in that case, and

5   we cited some of the language in our papers.  But our

6   opponents here advised the Court in Louisiana the final ruling

7   on the motion and the reasoning of the Court in the Texas

8   action may be significant to the resolution of issues likely

9   to arise in this action, which we completely agree with.  Our

10  view is what happens in Texas is going to have a collateral

11  estoppel effect on this alter ego argument brought by any of

12  the Plaintiffs' SPVs, certainly anywhere in the United States.

13          THE COURT:  So maybe I need to ask the Plaintiff

14  this question, but so the action is stayed in Louisiana.

15          MR. QUARTARO:  Yes.

16          THE COURT:  The ship was impounded initially.

17          MR. QUARTARO:  Yes.

18          THE COURT:  And then what happened, there was a

19  bond?

20          MR. QUARTARO:  Yes.

21          THE COURT:  And then the ship was released?

22          MR. QUARTARO:  Yes.

23          THE COURT:  Okay.

24          MR. QUARTARO:  Yes.  And of course this is as this

25  discovery is taking place.  I'd have to look at the dates; I

1    don't recall if it was before -- I'm reasonably confident it

2    was after the evidentiary hearing but before the supplemental

3    round of briefing.  It certainly was before the R&R issue,

4    otherwise we would have been in Louisiana making exactly this

5    argument but in a city that serves Cajun food.  So we would

6    have been in a different place but making, I think, very, very

7    similar arguments.  And you can see in that Exhibit-7, you

8    know, they go on and they advise the Court that in the Texas

9    action -- this is on page 4 of their unopposed motion for stay

10   in Louisiana, and it's the first full paragraph on the top of

11   that page.

12            THE COURT:  Go ahead.

13            MR. QUARTARO:  They say the Court is expected to

14   imminently issue a final decision on a pending amended motion

15   to vacate the order of attachment and dismiss the suit.  The

16   decision of the Court in the Texas action may have significant

17   bearing on the issues of the suit before this Court as to the

18   ownership of the property attached, i.e. the vessel, and be

19   useful in resolving parallel or identical issues of law and

20   fact.  And that's exactly what we have here.  It's exactly the

21   same thing.  The Texas court, once this R&R is dealt with by

22   the District Court, these issues will be decided one way or

23   the other with the admitted exception of Advantage Avenue, the

24   SPV that they've named here as opposed to Arrow, the one that

25   they named down in Texas.  So they're -- you know, in other

1    words, they're telling the Court in Texas, yes, there's

2    commonality of issues and facts.  Stay the action -- or

3    Louisiana.  Stay the action here in Louisiana.  Obviously

4    they're saying something different here.  All right.  Sorry, I

5    had to move places in my exhibit book.

6        So we've got a problem with the continuation theory that

7    -- or with the alter ego allegations that they don't fit in

8    the box that the 3rd Circuit has set up.  So the next

9    question, I would say, do they fit in any other boxes.  Well,

10   I think we've covered off the successor liability claim

11   because it doesn't comply with Polius v. Clark, it doesn't

12   comply with the 3rd Circuit precedent on alleging successor

13   liability and what that cause of action demands in terms of

14   alleged final product, if you will, of the alleged alter egos.

15   So I think that's a problem and I don't think that -- to the

16   extent it is a cause of action, I don't think they've

17   enunciated a cognizable cause of action under 3rd Circuit

18   precedent here in Pennsylvania.  The other thing that they

19   have is this fraudulent conveyance claim, but they've got a

20   problem with that, too.  The problem that they have with that

21   is there is no fraudulent conveyance cause of action under

22   federal law.  We don't have the federal -- body of federal

23   common law that gives them that cause of action.  And we have

24   that from the Maritime case in the 4th Circuit, and in the

25   Maritime context we do have federal common laws.  I'm sure

1    Your Honor is aware; it's one of the limited areas where we

2    do.  And in this Ost-West Handel case, they had a very similar

3    issue on the fraudulent conveyance side, and so they're

4    looking around, they say, well, we don't have admiralty law on

5    this.  What do we look at?  We look at state law.  So in this

6    case, of course, that's going to imply Pennsylvania state law.

7    That's what we've got.  So Pennsylvania has a statute, as it

8    turns out.  I confess that only one week ago I was unaware of

9    the existence of the Pennsylvania Uniform Fraudulent

10   Conveyance Act.  However, I have become a little bit familiar

11   with it.  And they've got a problem there as well, because

12   §359 of the Pennsylvania Fraudulent Conveyance Act is in the

13   creditor -- you know, it says that -- and it's captioned,

14   rights of creditors whose claims have matured.  That requires

15   claimants to bring a mature claim.  They don't have a judgment

16   or anything else.  They're not bringing a mature claim.  What

17   they're seeking is security for a claim made in an arbitration

18   in London that may become mature if they win the London

19   arbitration.  How they shoehorn themselves into the

20   Pennsylvania Uniform Fraudulent Conveyances Act and obtain

21   relief under that is thus far a mystery.

22            THE COURT:  Well, is that actually the case?  I

23   mean, isn't London just the question of the payments that were

24   due with respect to the charter, but this is about the

25   security for the charter ships.  So it's not -- even if you

1    have a resolution in London, it doesn't resolve the issue
2    here.
3              MR. QUARTARO:  It doesn't resolve the alter ego
4    issue.  That's certainly true, yes.  I think the alter ego
5    issue gets resolved, you know, where they allege it and try
6    it, and in this case --
7              THE COURT:  But what issue does it resolve?
8              MR. QUARTARO:  What issue does the --
9              THE COURT:  The London case.
10             MR. QUARTARO:  -- London arbitration?
11             THE COURT:  Yes.
12             MR. QUARTARO:  My understanding is that the London
13   arbitration will resolve whether or not Space is liable to the
14   Plaintiff for the claimed breach of charter damages.  My
15   additional understanding is that this is a somewhat
16   complicated case, and it's a complicated case because Space
17   chartered the vessel down to Glencore.  Glencore moved the
18   vessel to Venezuela where it's been restrained for some period
19   of time, and my understanding of what's happening in the
20   arbitration is it's a question of which entity is responsible
21   for those damages.  If --
22             THE COURT:  But I'd love to hear from Plaintiff on
23   this, because it seems to me that if that case is resolved, it
24   only is one little corner of this whole mess, and we're not --
25   mess is a legal term of art.  The security, which is what

1   we're talking about here and in Louisiana and in Texas, is a

2   whole separate issue apart from that London arbitration.

3           MR. QUARTARO:  Yes.

4           THE COURT:  So what happens in London is -- it may

5   have some interest in this litigation, but it's certainly not

6   the key component of this litigation.  And this litigation

7   doesn't go away regardless of how London is decided.

8           MR. QUARTARO:  I don't think that's correct, Your

9   Honor.

10          THE COURT:  Okay.

11          MR. QUARTARO:  Because what would happen if the

12  London arbitral tribunal, for example, was to find that Space

13  is not liable but Glencore is?

14          THE COURT:  You're right, yes.  Right.

15          MR. QUARTARO:  So then that's it.

16          THE COURT:  But so if there's one way in which it

17  rules, everything may go away.

18          MR. QUARTARO:  Well, if --

19          THE COURT:  But there are other ways in which it

20  could rule and everything else would remain.

21          MR. QUARTARO:  Respectfully, it's a binary decision

22  set.  The arbitral panel will determine if Space is liable or

23  not.  If the answer to that is not, then this is irrelevant --

24          THE COURT:  Right.

25          MR. QUARTARO:  -- because obviously there is no

1    liability.

2         THE COURT:  But if the answer is it is --

3         MR. QUARTARO:  Then maybe this is relevant if they

4    can build this house.

5         THE COURT:  Okay.

6         MR. QUARTARO:  I think, to put a fine point on it, I

7    think that's the result.  There is, of course, a third

8    possible result, and I'm not sure the procedural posture, so I

9    can't represent that Glencore is in the case or, I don't know,

10   maybe Space is arbitrating against them.  I'm not quite sure

11   what's happening there.  But it may be that the arbitral

12   tribunal winds up finding that Glencore is responsible

13   somehow.  So there is a third way in there somehow, Your

14   Honor.

15        THE COURT:  Okay.

16        MR. QUARTARO:  But it's binary with respect to

17   Space, no -- I think there's no doubt about that.  So I think

18   the London -- you know, the London arbitration is certainly

19   very important on that issue.  Here, though, with respect to

20   the -- you know, to their theories of liability and the

21   fraudulent conveyance, if they can't place them -- if there is

22   no admiralty law on it and we're looking to state law, they've

23   got to put themselves under the Pennsylvania Uniform

24   Fraudulent Conveyances Act, and our view is that they don't

25   have a mature claim there because there's been no finding of

1    liability.  So they can't bring a fraudulent conveyance saying
2    that Space -- and it's not even Space, by the way.  They're
3    saying Geden Holdings had other ships and it sold those ships
4    here, that they didn't have a security interest in or anything
5    like that, but that's the sum and substance of their
6    allegation.  So it's not a ship owned by Space that was sold,
7    it's ships owned by other companies owned by Geden that were
8    sold.  That's pretty important.  It's not Space.  Space
9    chartered a ship in from their -- from the Plaintiff.  And so
10   they -- to even get another -- you know, it is slightly more
11   complicated because it's Space to Geden Holdings to ships
12   formerly owned by Geden Holdings that are sold to Advantage.
13   So it's a little bit convoluted in that respect.  But Space is
14   not alleged to be a ship owner that got rid of an asset to
15   Advantage to the disadvantage of Plaintiff, Geden Holdings is.
16        And that brings me to my next point.  When we look at
17   this chain of alleged alter egos, Geden Holdings is not there.
18   And unfortunately, Your Honor, Geden Holdings is not there
19   because Geden Holdings is present right here in Philadelphia.
20   They're registered as a foreign corporation to do business in
21   Pennsylvania, and they've appointed CT Corporation as their
22   agent for service of process in this district.  So Plaintiff's
23   theory is somehow that Space is liable, and it's alleged, and
24   I believe it is paragraph 27 in their verified complaint,
25   owned by Geden Holdings, but we're not going to name Geden

1    Holdings as a Defendant because that destroys our access to

2    Rule B, which is then owned by Emin Karamehmet and on with the

3    rest of their chain.  But they've left out a link.  They've

4    left out a link.  How did they jump from Space to the owner of

5    Geden Holdings without naming Geden Holdings as a Defendant?

6    And they can't name Geden Holdings as a Defendant, because if

7    they do, they can't give Your Honor a Rule B affidavit that

8    says that none of these alter egos are present here in Your

9    Honor's district.  And that's a fairly significant problem

10    with their theory, Your Honor.  I would, you know,

11    unfortunately have to suggest, I mean, that's obviously a

12    deliberate choice on their part, not to name that party, the

13    critical central link in their alleged chain of alter egos, in

14    the verified complaint.  That's also why you don't see them in

15    the affidavit supporting the Rule B attachment, Your Honor.

16           THE COURT:  As I understand it, the relationship is

17    between Space Shipping Limited, and Genel Nakliyati, not Space

18    Shipping and Geden Holdings.

19           MR. QUARTARO:  I would --

20           THE COURT:  I mean, that's what the allegations are,

21    right?

22           MR. QUARTARO:  It is -- I'm -- respectfully, Your

23    Honor, I'm not sure that that's correct, and I would point

24    Your Honor right back to that memorandum -- that R&R footnote.

25    This is the same thing they did in Texas.  They tried to

1  conflate the manager, who's under separate ownership by Mr.

2  Karamehmet, with Geden Holdings.  And fortunately for us, the

3  Magistrate Judge realized that they were trying to conflate

4  those two entities, and she even put in a footnote in that

5  R&R, and that's exactly what they're doing in these papers.

6          THE COURT:  Well, on -- let's -- setting aside the

7  R&R, is there anything in your submissions that provides

8  evidentiary support for your position that Geden Holdings has

9  to be in the case?

10          MR. QUARTARO:  Is there -- yes, I would say -- let's

11  take a look at their verified complaint.

12          THE COURT:  Well, no, I asked you whether there's

13  any evidence.

14          MR. QUARTARO:  Well, we need --

15          THE COURT:  I know what their -- I mean, I can read

16  their verified complaint.  We're talking about evidence.

17          MR. QUARTARO:  I'm sorry, can Your Honor repeat it,

18  because we've got a lot of evidence in this case, and it's not

19  all in this case.  A lot of it's down in Texas.

20          THE COURT:  You made the representation that Geden

21  Holdings needed to be in this case because the relationship is

22  between -- is it Mr. --

23          MR. QUARTARO:  Karamehmet?

24          THE COURT:  Yes, and Geden Holdings.  That

25  statement, that the relationship is between Geden Holdings and

1    Karamehmet, is there any evidence in your submissions to

2    support that proposition?

3         MR. QUARTARO:  I'm not sure that that's something

4    that could be supported on an evidentiary basis, Your Honor,

5    because it's an allegation.  So they've made the allegation

6    that Space is owned by Geden Holdings.  And on the basis of --

7    I mean, that's all that we have before us is that allegation.

8    But having made that allegation and fail to name Geden

9    Holdings as a Defendant, that's what creates their problem.

10   Now I don't think that there is any dispute as to the fact

11   that -- and this is what they've alleged, that Geden Holdings

12   owns 100% of Space.  So I'm not sure that it's a question of

13   evidence that would be before Your Honor so much as a question

14   of what the Plaintiff's theory of the case is.

15        THE COURT:  Okay.

16        MR. QUARTARO:  And we can see right here, it is

17   paragraph 27, and you can see there is, you know, continuity -

18   - it's their letter H -- continuity of shareholders is the

19   result of the controlling seller corporation Geden Holdings.

20   And that's maybe four or five lines from the bottom of that

21   page 9, Your Honor, which is paragraph 27.

22        THE COURT:  Okay, but to go back to the point, your

23   exhibits included a website and you asked the Court to take

24   judicial notice of that website, and also you ask -- you state

25   something in your statement of facts with respect to Geden

1    Holdings.

2              MR. QUARTARO:  Oh, I'm sorry, perhaps I

3    misunderstood when Your Honor was asking for evidence.  You

4    were asking for evidence of their presence?

5              THE COURT:  Correct.

6              MR. QUARTARO:  I'm sorry, Your Honor, I completely

7    misunderstood your question.  I thought what you were looking

8    for was some evidence of the Geden Holdings ownership of

9    Space, and that's reliant, of course, we're relying for that

10   on their allegations.

11             THE COURT:  But, okay, but you've taken the position

12   that Plaintiff intentionally left off a necessary party, Geden

13   Holdings, and you say that Geden Holdings is registered to do

14   business in Pennsylvania and has an agent authorized to accept

15   service in Pennsylvania.  And in support of that proposition

16   you attach a website and you ask the Court to take judicial

17   notice of that website.

18             MR. QUARTARO:  Yes, Your Honor.

19             THE COURT:  There is, however, no evidence either

20   attached or otherwise that mentions anything about a

21   Philadelphia agent authorized to accept service.  So that's a

22   statement you just made here today --

23             MR. QUARTARO:  Ah.

24             THE COURT:  -- but there's nothing in the record to

25   that effect, is that correct?

```
 1          MR. QUARTARO:  No, I would say that what it really
 2   goes to is the way the Pennsylvania Department of -- I forget
 3   if it's state.  I believe it's state website lists things, and
 4   if you look at the document that we put in, you can see Geden
 5   Holdings, then the next business entity name, next is name
 6   type, and then after that is address, and that's CT
 7   Corporation System here in Philadelphia.  And that is their --
 8   that is what this page appears to put as the location of their
 9   registered agent, whoever that may be.  In this case it
10   happens to be CT Corporation --
11          THE COURT:  Okay.
12          MR. QUARTARO:  -- Philadelphia.  I would say that I
13   don't believe that there is any issue of fact as to whether or
14   not they are registered as a foreign corporation licensed to
15   do business in Pennsylvania, or whether or not they've
16   appointed CT corporation as an agent.  Plaintiff has made no
17   representation on that fact either.  But should Your Honor
18   wish for anything supplemental on that, I'd be very happy to
19   obtain it.  I'm sure we'll be able to do that.  But this is
20   what the Department of State has provided on the website.
21   It's a little bit different than some other states that, you
22   know, have different informational columns, but there is no
23   doubt that they are registered here and that they have listed
24   a office at CT Corporation as their agent.  And so under the
25   two tests present and can be served, as we've cited in the
```

1    case law, they appear to check that box, Your Honor.  And
2    frankly, I don't believe that that's an issue that's in
3    contention.  In fact, I believe that it is expressly not in
4    contention, because if it was you would see Geden Holdings as
5    a party, as a named party.  And the rest of our contention,
6    Your Honor, summarized I think very accurately.  Yes, we think
7    they're deliberately omitted.  Incidently, exactly the same
8    thing in Texas.  Geden Holdings has exactly the same thing,
9    registered in Texas as a foreign corporation licensed to do
10   business, and maintained an office and a agent in Texas.
11   However, the Court -- I believe it's the last footnote, if I
12   recall, the Court did not reach that, and fairly so and for
13   good reason.  There was a fairly complicated relation back
14   issue that we would have really had to get into if the Court
15   had gone down that path and the Court, you know, ruled in the
16   Advantage Defendants favor on other grounds.  But the issue
17   was raised, and it was exactly the same factual circumstance
18   down in Texas as it is here.  Present, registered, omitted
19   from the caption, necessary party because they're the central
20   link in the alleged chain of alter egos.
21        And we do cite a case.  It is admittedly an SDNY case
22   that finds that where your -- in the Maritime Rule B context
23   where you're naming alter egos, if one of the putative alter
24   egos is present in the district, you're saying they're all the
25   same, therefore they all are.  And I would say that that is

1    rather persuasive reasoning because if you're -- if one's

2    arguing that five companies are the same, you can't argue that

3    they're the same for all purposes except for jurisdiction

4    because one of them is present here.  They're either the same

5    or they're not.  And so I think that's pretty persuasive

6    reasoning.

7         I think that that mostly wraps up what we had in our

8    papers.  I think I would ask if Your Honor has any questions

9    about -- any additional questions about anything that we've

10   presented today, I think, I would be happy to answer it.

11            THE COURT:  Well, I may come back to you.  I have a

12   little bit of a scheduling issue because I didn't fit you in.

13   I have to give a presentation at 12:30, which involves a lunch

14   which I have to be at.  So I'm going to be gone from 12:30 to

15   1:30.  I don't want to start your argument now and have you

16   have to stop in the middle of it.  So let's get back here at

17   1:30 and we'll start off with your argument.  Who will be

18   doing the argument on your side?

19            MS. REEVES:  Mr. Gaitas.

20            THE COURT:  Okay.  Mr. Gaitas.  Okay.  And I am so

21   sorry.  I didn't catch your name at the very beginning.

22            MR. QUARTARO:  That's okay.  It's Quartaro.

23            THE COURT:  Quartaro?

24            MR. QUARTARO:  Yes.

25            THE COURT:  Neil Quartaro.  Okay, great.

1           MR. QUARTARO:  Thank --

2           THE COURT:  I'll see you at 1:30.

3           MR. QUARTARO:  Thank you, Your Honor.

4           THE CLERK:  All rise.

5       (Recess)

6           THE CLERK:  All rise.

7           THE COURT:  Good afternoon.  Have a seat.  Okay,

8   we're starting with Mr. Gaitas, Gaitas?

9           MR. GAITAS:  Thank you.  Thank you, Your Honor.

10          MR. QUARTARO:  One brief moment, Your Honor, just

11  before we start.  It was drawn to my attention over lunch that

12  that last exhibit that we had looked at, the printout from --

13  showing the Geden Holdings registration, there was the address

14  of the location that we obtained that from and I think we put

15  that in our statement of facts as well.  That is from the

16  official government website.  That's not a third party

17  website.  And as such, I believe it's probably a self-

18  authenticating document because of that.  And the address is

19  located at the bottom and you can see that's a .PA.Gov.  And

20  we didn't discuss that, so I just wanted to draw Your Honor's

21  attention to that.

22          THE COURT:  Thank you.

23          MR. QUARTARO:  Thank you.

24          THE COURT:  Okay.

25          MR. GAITAS:  May it please the Court, there is a

1    question that I would like to ask regarding the format, it may

2    be a little too late, that the Court wants to follow in this

3    ruling 4(f) hearing.  I read the case <u>Salazar v. Atlantic Sun</u>,

4    881 F.2d 73 (Third Circuit, 1989), that states that the format

5    of the hearing is at the discretion of the trial Court.  I

6    mention this because Ms. Bacha traveled from Greece to come

7    here just in case the Court wants to hear from the witness who

8    has verified the Complaint.

9        Thus far, we have addressed the issues of law and I can

10   address -- I can speak to those.  But if there is an issue of

11   fact that the Court wants to know about, I certainly have

12   Ms. Bacha available.

13       THE COURT:  Well, I think the issue is -- I mean,

14   this is a hearing, it's not an argument.  You know,

15   Mr. Quartaro has chosen to argue rather than to provide

16   documentary or testamentary evidence.  Certainly his decision

17   is not binding on you.  If you feel that it behooves you to

18   introduce testamentary evidence, that's up to you.

19       MR. GAITAS:  Thank you, Your Honor.  If there is any

20   question that comes up during my argument that needs to be

21   illuminated by the witness then I would like to ask the

22   Court's permission to call her.

23       THE COURT:  Absolutely.  You have my permission, but

24   you should not rely on me asking you a question in making your

25   decision as to whether you should put her on the stand.

1    Because obviously I am asking questions having read these
2    pleadings or really having only had these pleadings for a very
3    short period of time.  So if you think that there is any piece
4    of information that would be useful to me by having her
5    testify then you should put her on the stand and have her
6    testify.
7              MR. GAITAS:  We will proceed and see if this is
8    necessary --
9              THE COURT:  Okay.
10             MR. GAITAS:  -- becomes necessary.
11             THE COURT:  Okay.
12             MR. GAITAS:  Very briefly, the argument of the
13    owners of the Advantage Avenue and the Advantage Defendants is
14    that we have not -- there's an issue of collateral estoppel
15    because of the proceeding that had taken place in Texas and
16    their magistrate's recommendations that are pending that have
17    been objected to.  And we're waiting for the decision of the
18    Court -- of the District Court.
19        The argument is a collateral estoppel argument.  We have
20    not pled the other arguments.  We have not pled the prima
21    facie alter ego veil piercing case nor plead a prima facie
22    successor corporation claim or a fraudulent conveyance claim.
23    And third is that we did not join a necessary party, namely
24    Geden Holdings Limited.  This is a summary of their argument.
25    May I address first -- the first argument, and that is the

1    issue of collateral estoppel?

2            THE COURT:  Yes.

3            MR. GAITAS:  And I think that not much time needs to

4    be taken over this argument for the very simple reason that

5    there has not been a decision by the District Court which is

6    required to review the case based on the objections de novo.

7    So the case that the Defendants have cited in support of the

8    collateral estoppel argument was National Railroad Passenger

9    Corporation v. Pennsylvania Public Utility Commission, 288

10   F.3d 519 at page 525 (Third Circuit, 2002).  And it is very

11   clear that the standard for collateral estoppel is that you

12   must have a final judgment on the merits.  And we have not had

13   that.  That is pending.

14       The same issue is discussed extensively in a District

15   Court decision from the Southern District of New York in

16   D'Amico Dry Limited v. Primera Hellas LTD, 116 F.Supp. 349 at

17   page 357.  I don't think that we need to take up the Court's

18   time with arguing about the proceedings in Texas because there

19   is not final decision on the merits.

20       The Third Circuit Court of Appeals, with regard to

21   magistrate's recommendations under 28 U.S.C. Section

22   636(b)(1)(B) in the case of United Steelworkers of America v.

23   New Jersey Zinc Company, at 828 F.2d 1001, notes that it is

24   well settled that the magistrate to whom a motion has been

25   referred under this section of the Act is merely a

1    recommender.  Only if the District Court's (indiscern.) of an

2    order can put the proposed recommendation into effect.  In

3    conclusion, there is no issue of collateral estoppel here.

4        If I were to move then to the next area of my friend's

5    argument, which discusses the issue of the Plaintiffs having

6    failed to make a alter ego veil piercing case, very simply

7    Plaintiff has not plead alter ego or veil piercing.  It has

8    put forward two alternative theories for its claims, the first

9    being successor corporation liability based on the successor's

10   de facto merger with successor, alternatively on the basis of

11   a mere continuation of the predecessors business.

12            THE COURT:  Do you think that discovery is required

13   on those issues?

14            MR. GAITAS:  That there should be discovery?

15            THE COURT:  Yes.

16            MR. GAITAS:  If Your Honor wishes to grant

17   discovery, it might be helpful, yes.  Further discovery

18   because it was all done in Texas, but these are issues that

19   could be explored.  We could use it.

20            THE COURT:  Well, let me ask you another question.

21   Is there anything in the record so far which would allow me to

22   evaluate, assuming that in fact you have not plead alter ego

23   veil piercing, that would allow me to evaluate whether there

24   is successor liability, whether there is -- you know, what --

25   predecessors' interests and the existing interests.  Is there

1    anything that I can look at in the record that will help me in

2    that analysis?

3         MR. GAITAS:  Your Honor, I believe that there is

4    sufficient -- there is -- let me correct myself.  There is not

5    in the record, because this is a fact intensive inquiry.  So

6    discovery would be helpful, but we feel we have made a prima

7    facie case.  How strong it is and if it can withstand any

8    other scrutiny, of course we would like to have more

9    discovery.

10        THE COURT:  Okay.  Move forward.

11        MR. GAITAS:  And we believe, Your Honor, since we

12   are in this area that we have made a prima facie case for

13   successor corporation liability based on the guidance we --

14   and I'm arguing this in the brief in support of this, in the

15   case of Lehman Brothers Holdings Inc. v. Gateway Funding

16   Diversified Mortgage Services, citing at page 5 of our brief.

17   It is from the Eastern District of Pennsylvania and it's a

18   very comprehensive decision as to the basis -- the theory and

19   the basis for allowing these sort of claims.  And I don't want

20   to bore the Court with reading again what I have written, I

21   have copied and cited from this decision, but it is

22   essentially that there is a continuation of the enterprise of

23   the seller corporation when you have the same assets, but

24   apart from the same assets, you have the same management

25   personnel, physical location, general business operations.

1       And our argument in this case is that all of these

2   elements, as pled -- we pled them in our Complaint, are

3   present here.  You have the same 11 tankers, the crude oil

4   tankers, we make a distinction, because there were product

5   tankers.  They have been moved to another scheme by the same

6   -- generally by the same actors, but there is no Advantage

7   tankers there.  There is a trust that is operated by we don't

8   know.  It's in the Netherlands Antilles, but they're managed

9   under that trust.

10      So there is a -- the issue of the continuant of

11  shareholders that my friend brought up in the analysis of the

12  Court in the Lehman Brother case does not strictly mean that

13  stock has past.  It suffices that the seller in quotes

14  "seller" has retained an economic interest in the successor

15  corporation.  And that interest in the successor corporation

16  in the instant case is that of the management of the tankers,

17  technical, financial, administrative, that has been retained

18  by Geden Lines.  Geden Lines has ship management agreements

19  for each of these tankers worth $365,000 a year.  $1,000 a day

20  for all 11 tankers.

21      The owner of that entity is Mr. Emil (indiscern.).

22  That's how he's interested in there, plus he's interested in

23  the control of the overall technical, commercial, and every

24  other kind of operation that Geden Lines is doing.

25      This -- another element, and I'm backtracking a bit from

1    the Lehman Brother case is that the seller corporation ceases

2    its ordinary business operations, liquidates, and dissolves.

3    This is essentially what has happened here.  Geden Holdings

4    does not own any one ship companies anymore.  It has nothing

5    as far as visible assets.  We don't know its financial

6    position in Turkey, but that is irrelevant.  It is what they

7    have here.  Having money in another jurisdiction is not before

8    the Court in a (indiscern.) case, so says (indiscern.), in

9    which this argument was raised, that you have a highly solvent

10   Defendant.

11          And the fourth element in the Lehman Brothers case for

12   making out a successor corporation case is the purchasing

13   corporation assumes the obligations of the seller ordinarily

14   necessary for the uninterrupted continuation of the normal

15   business.  And we have pled in our Complaint that this role

16   has been fulfilled through Geden Lines that has assumed all

17   the functions that it used to perform when the holding company

18   was Geden Holdings.

19          I would like to draw attention to a quote at the -- it's

20   cited on page 6 of the Plaintiff's brief from page 255 of the

21   Lehman Brothers decision as to the kind of inquiry that the

22   Court makes when it considers successor liability.  And if I

23   just may partially read from that.  "Because of the complex

24   nature of corporate reorganizations and acquisitions, the

25   intrinsic nature of a transaction cannot be ascertained merely

1    from the form by which it is structured."  The Court must

2    infer not only to all provisions of the agreement, but also to

3    the consequences of the transaction and of the purposes of the

4    provisions of the corporation law said to be applicable.

5        A de facto merger will always be a de facto merger --

6    will always be subject to the fact specific nature of the

7    particular underlying corporate realities and will not always

8    be evident from the formalities of the proximate corporate

9    transaction.  So it is an equitable inquiry that calls on the

10   Court to go beyond a formal restructuring of looking at

11   instruments whereby vessels were transferred.  The Court needs

12   to go a little deeper than that.  And this is where discovery

13   might be very useful.

14       Now, Mr. Quartaro argued that fraudulent transfer issue

15   is governed by state law and it is completely bound to state

16   law and there must be a judgment in bankruptcy.  This is not

17   correct.  There's very strong law on this very issue in <u>Swift</u>

18   <u>& Co. Packers v. Compania Columbiana del Caribe</u>, 339 U.S. 684

19   at pages 695-696, 1950 decision which sets the standard for a

20   Court sitting in admiralty, protecting its jurisdiction when

21   it is challenged by frustrating and ultimate decision by

22   transferring assets away.

23       And this is precisely what the Court did in the <u>Swift</u>

24   case.  There was a vessel.  There was a breach of a contract

25   of carriage.  And the owners of the vessel had another ship

1    and they transferred it to a brand new company.  That ship was

2    seized in the Panama Canal and the lower Courts ruled that

3    this was an issue in equity, and this was a Court of

4    Admiralty, and they didn't have the power to grant the relief.

5    It went to the Supreme Court and it is -- the Supreme Court

6    ruled that it is inherent in the power of a Court of Admiralty

7    in order to protect its jurisdiction to order the remedy --

8    the equitable remedy necessary.  And that is setting aside the

9    fraudulent conveyance.

10        The same decision cited in several cases, but most recent

11   I'm aware of is <u>Flame SA v. Freight Bulk Private Limited</u>, 807

12   F.3d 572, 582 (Fourth Circuit, 2015).  I will move quickly to

13   the next area of the argument that Plaintiff has not joined a

14   necessary party.

15        And my friend cited in support of this argument a New

16   York case, which is good law, which stands for the proposition

17   that one -- and that case was <u>Glory Wealth</u>, 590 F.Supp. 562 at

18   page 564 (Southern District of New York, 2008), which lends

19   for the simple proposition if an alter ego of a group of

20   companies is present in the jurisdiction and the Court has

21   jurisdiction over that entity, it has jurisdiction over all of

22   the other entities, they are deemed to be present in the

23   jurisdiction.  And this is what our opponents argue.

24        There is a subtle difference, though.  This is not an

25   alter ego veil piercing case.  We haven't uttered the word

1    alter ego or veil piercing in the Complaint or in any of our

2    briefings.  But even -- but in the context in which our

3    opponents raised this issue, namely they being strangers as

4    they claim to Geden Holdings, claim to be a separate group, my

5    friend tried to diagram to show the separation of the two.

6    They're far apart.  But they're still calling for the joinder

7    of (indiscern.) as a necessary party and raise this argument

8    of -- in the context of alter ego.  They're trying, in effect,

9    to pierce their own corporate veil.

10        I'm aware of at least one decision in the context of

11   diversity of citizenship -- on the jurisdictional issue in

12   which a party tried to do precisely that because it was of the

13   citizenship as the Defendant.  They said our alter ego is

14   company X, whatever it was, and the Court denied that of them

15   holding that a party may not pierce its own corporate veil to

16   gain a jurisdictional advantage, which is precisely what the

17   Defendants are trying to do.  The case is Payphone LLC v.

18   Brooks Fiber Communications, 162 [sic] F.Supp. 175 at page

19   179.  That's from the District of Rhode Island.  And they cite

20   McCarthy v. Azure, 22 F.3d 351 at 362, 363.

21        Here, to put it another way, Geden Holdings, they argued

22   that Geden Holdings or none of the Geden groups own the vessel

23   that has been attached.  They argued that it is Advantage

24   Avenue.  But they also argue that Geden should be joined as it

25   is present in the district.  They can't have it both ways.

1    Because the only person -- the only party that needs to be

2    joined is one that has an interest in the vessel.  So these

3    are the contradictory argument.

4         The grounds for vacatur, vacating an order of maritime

5    attachment and garnishment were very plainly spelled out in

6    the Aqua Stoli case.  They were very simple.  In order for --

7    in order of attachment to be vacated, the four elements that

8    are required also for making the order must be present.  There

9    must be a valid maritime claim.  The Defendant must not be

10   found in the district.  The Defendant has property in the

11   district and there is no maritime or other law -- statutory

12   law barring that?

13        We submit that all of these four elements are present and

14   we have submitted sufficient evidence to uphold this.  The

15   only issue that has been raised by our opponents is the

16   ownership -- ultimate ownership of the Advantage Avenue, and

17   we have addressed this with (indiscern.) who made the prima

18   facie case based on the successor corporation theory.  All of

19   the earmarks of a successor corporation are here for making a

20   prima facie case.

21        There is jurisdiction to vacate also on equitable grounds

22   again relying on Aqua Stoli, and these are if the Defendant is

23   in an adjacent district, that he can be served.  Or if the

24   Defendant is -- if there is adequate security for the claim,

25   this is not present here.  These elements are not present

1    here.   The Defendant owns the ship.   It's Space Shipping

2    Limited.   That's the Defendant.   That's the obligor of the

3    Plaintiff.   And Space Shipping Limited is not registered

4    anywhere here.   Space Shipping Limited cannot be found in any

5    adjacent district.

6         And the vessel, the CV Stealth, is in Venezuela.   She's

7    being held by the authorities there for reasons that we don't

8    know and don't understand.   She's not being released.   Geden

9    isn't -- Geden Holdings or rather Space Shipping, the charter,

10   has (indiscern.) the vessel.   They have their own skeleton

11   crew on board.   They have it.   She's been there, Your Honor,

12   for two years.   They have not redelivered her and hire is

13   running daily.

14        The charter has been asked repeatedly to pay, has been

15   invoiced, and has not paid.   And this is why we do not have

16   enough security since the last security we obtained, which was

17   with the attachment in Louisiana.   The time has gone by and

18   they have not paid the additional hire that has accrued.   This

19   is why we're above $6 million in total unpaid hire.

20        If the Court has any questions from me, I'll be happy to

21   answer them.

22             THE COURT:   I -- what I would like to -- I'd like to

23   ask both parties.   So here we are in a situation where the

24   ship has been impounded.   It's been in Marcus Hook dock for,

25   what, a few days now.

1          MR. GAITAS:  Yes.

2          THE COURT:  And --

3          MS. REEVES:  A week, Your Honor.

4          THE COURT:  What?

5          MS. REEVES:  A week, Your Honor.

6          THE COURT:  A week.  When did I -- I thought I

7    issued my order on Friday.

8          MS. REEVES:  Right.  Yes, a week ago last Friday.

9          THE COURT:  Yes, so it was off the coast of Marcus

10   Hook for a few days, but it was not impounded.  It may have

11   been here for a few days, but it wasn't impounded until

12   Friday, correct?

13         MR. TEDROSS:  That's correct.

14         THE COURT:  Okay.  So as I understand it generally

15   in this case is what happens is there's an effort to move

16   things along.  The Defendant posts a security bond in the

17   Registry of the Court and the boat is then released.  Why is

18   that not happening here?

19         MR. GAITAS:  Your Honor, we're -- we would be

20   receptive to have security posted, but it is the Defendant

21   that has to post it.

22         THE COURT:  I understand that, but -- so why -- this

23   is -- why is that -- rather than having a ship just sitting

24   there and, you know, Defendant paying up and you not really

25   getting what you want, why is the -- why is -- has there been

1    discussions of -- settlement discussions at all?

2    MR. GAITAS:  There have been no discussions for

3    settlement.  I have not been approached and I -- we have

4    talked before about settlement, but you know, these are

5    without prejudice discussions and I --(indiscern.), the last

6    time I talked was with the Defendants, Advantage Tankers

7    Defendants.  Their London solicitor, who is also I understand

8    now in charge of the New York office.  This is an English

9    solicitor's firm, Watson Farley.  And I met him in Greece last

10   June and we said, okay, let's find a solution, but I was

11   waiting.  He was going to get back to me.  I haven't heard

12   further.

13   THE COURT:  So, Mr. Quartaro, you don't have any --

14   do you have any authority to try and get some kind of security

15   in this case?

16   MR. QUARTARO:  It's certainly possible, Your Honor.

17   The -- there is a number of issues.  I'd say primarily the

18   large amount that's being sought here is a challenge, as is

19   clear from the record.  This particular group of Defendants in

20   the other actions ponied up multiple millions of dollars in

21   security.  The instant backs ask is, I believe, the Addendum's

22   3.5, Your Honor.  So, you know, playing that forward, they're

23   looking for, I don't know, maybe $4 million in cash security.

24   That's a lot of money.  That is a lot of money, Your Honor,

25   especially --

1           THE COURT:  Well, let me tell you my thinking on

2    this is that with respect to the collateral estoppel argument,

3    there is no District Court decision.  There's no final

4    judgment on the merits.  There's de novo review of the R&R.

5           Looking at the R&R, quite apart from that fundamental

6    issue, it appears to apply only to tank punk and there's an

7    issue in my mind as to whether the substantive law would be

8    different in this case given that that is decided under Fifth

9    Circuit law.  And there may be some Third Circuit law here.

10          And certainly looking at the law in the Third Circuit,

11   it's quite clear that an R&R is only a recommendation.  I

12   believe, in fact, that a Magistrate Judge has no authority to

13   issue an opinion.  It is actually beyond the scope of their

14   authority.  So, clearly, there's no collateral estoppel, at

15   least at this point.  There -- it may be that once the

16   District Court has ruled that that issue will once again be

17   relevant.

18          So I turn to the other issues and, quite frankly, I was

19   expecting, you know, some -- because it was a hearing rather

20   than an argument, I was expecting some testimony, particularly

21   on the issue of successor liability and the relationship

22   between the parties, but I don't have it.  So my view is that

23   you need discovery and we will then have an evidentiary

24   hearing.  But that's obviously going to take some time.  And

25   we're in the position of we have a ship sitting in Marcus

1   Hook.  I am sure that the Coast Guard is not too happy about

2   having a ship sitting there and taking up space.  So really

3   the question is, is there a way that you folks can work

4   through something so that everyone's interests can at least be

5   protected for now and the Coast Guard can get what it wants,

6   which is just it doesn't want to have that ship, I assume,

7   sitting in its dock.

8        So that's where I am right now.  And I think the question

9   is, is there any way that you good folks can resolve that

10   issue with respect to what are we going to do with a ship.

11            MR. GAITAS:  We're very open to any proposals from

12   those who have to put up the security.

13            THE COURT:  Any proposal?

14            MR. QUARTARO:  No, Your Honor.  I don't have

15   authority to offer security at this time.  As we did put in

16   our papers, our client is Turkish and as Your Honor may be

17   aware, Turkey, of course, is a Muslim country and has largely

18   been closed for the Eid holiday.  And so, approaching their

19   banks and doing those things simply could not have occurred

20   over the last week.

21        In addition, you know, I would have to point out it's a

22   tough economy for ship owners.  It has been a long and

23   difficult road since '07 or '08 for many of them and we are

24   talking, as my opponent has identified, we are talking about

25   claims by this Plaintiff and a couple of others against Geden

1   companies that are being secured by assets from a completely

2   different group of companies.  And that, in and of itself, of

3   course, creates problems.  How you -- you know, how do you --

4   you've got to get that past your own board of directors.

5   That's not an easy thing to get over the line.

6        So, unfortunately, I don't have instructions on that

7   right now, Your Honor.  And with respect to the nature of the

8   hearing here before Your Honor today, I think, you know, our

9   view on the discovery is that this is exactly -- this is

10  precisely the argument that was made down in Texas.  We did

11  it.  We went through all of that discovery and Your Honor has

12  the R&R and you can see what the result of that was.

13           THE COURT:  But -- right.  So that was in Texas.

14           MR. QUARTARA:  Yes.

15           THE COURT:  So and this is here.  So I assume that

16  given the fact that the discovery was already heard in Texas,

17  that the discovery in this case will be easier because you

18  already know what each other has.  There may be some

19  additional information that you need.  But the question that I

20  have before -- because really the ship is your headache, not

21  my headache.  You know, what -- and Marcus Hook is your

22  headache, not my headache.  It may become my headache at some

23  point, but right now it isn't.  So the question is how long do

24  you think it would be necessary to get the discovery on the

25  successor liability issue and whether the -- that such control

1    was used to commit a fraud or wrongdoing in this matter.

2              MR. GAITAS:  Your Honor, with previous experience --

3    (indiscern.) previous experience, scheduling is difficult

4    between the parties but I should think if we give ourselves a

5    few months from today, I think that should --

6              THE COURT:  How many months?  Three months?

7              MR. GAITAS:  Three months from today.  That should

8    be adequate.

9              MR. QUARTARO:  Your Honor, I would just ask as a

10   point of clarification from Plaintiff's counsel, what

11   discovery in addition to the discovery that he's already

12   obtained would he be looking for?  The owner of the Advantage

13   group has been deposed.  The CEO has been deposed.  The CFO

14   has been deposed.  We've taken his documentary requests.  He's

15   had responses to all of those.  No objections were raised in

16   the Texas proceedings.  I mean, if we're going to go three

17   months, okay, but what are we going to be doing during those

18   three months if -- as Your Honor accurately points out, that

19   underlying discovery has already occurred.  That's already

20   there.

21             THE COURT:  Okay.  Mr. Gaitas, what's your response

22   to that?

23             MR. GAITAS:  I would -- with respect, I would ask my

24   friend not to ask me to tip my hand as to what I'm planning to

25   ask for because I would be revealing it.  I want to consult

1    with my clients.  I want to go back to my files and see what I

2    need.  I need quite a lot more.  And it would involve parties

3    other than the Advantage group Defendants.  It would involve

4    Geden Defendants.

5              THE COURT:  Well, you're going to have to --

6    although there's been discovery in that other matter in Texas,

7    you're going to have to have some negotiations as to whether

8    that discovery can be used in this case.  So that is -- that's

9    not discovery, per se, but it requires negotiations of some

10   sort and I don't know -- it could be easy negotiations.  It

11   could be difficult negotiations.  I don't know.  I think

12   probably 90 days is excessive.  I mean, I think we're limited

13   to 60 days.  And then you need some briefing following that.

14   So I'll give you -- and I'll calculate all of the deadlines

15   and provide an order.  How many -- how long after the close of

16   discovery would you need in order to file a brief?

17             MR. GAITAS:  I should think about 30 days, at least.

18             THE COURT:  30 days?

19             MR. GAITAS:  Taking into account our other case

20   loads and things, you know --

21             THE COURT:  So you -- but the --

22             MR. GAITAS:  Yes.

23             THE COURT:  It would be -- the Defendant would be

24   filing the moving brief, right?  You would be filing the

25   moving brief?

1           MR. QUARTARO:  Well, I -- that's an excellent

2      question, Your Honor.  Good question.  I'm not sure leaving

3      from here exactly what the procedural posture would be.  I

4      mean, it's Plaintiff's case, obviously.  We're now going to

5      discovery.  I mean, is this functionally motion for summary

6      judgment?  I'm not clear on what the procedural posture would

7      be.

8           THE COURT:  Well, my concern is whether I have

9      jurisdiction.  I don't know whether I have jurisdiction and I

10     don't have enough information to tell whether I have

11     jurisdiction.  So I suppose it would be a jurisdictional brief

12     and discovery would be fundamentally jurisdictional discovery.

13     The question is how far does that go and sitting here today,

14     as you suggested, Mr. Quartaro, the discovery issue -- the

15     jurisdictional issue is so -- it's sort of a Gordian knot in

16     this case.  And so I think it's up to you to determine whether

17     -- how extensive the discovery should be and I assume you're

18     going to have some back and forth on that.

19          But given that it will essentially be a lack of

20     jurisdiction motion, I think it would be on you to file and on

21     you to respond.  Unless you think otherwise.  I mean, I'm open

22     to suggestions here.

23          MR. GAITAS:  Your Honor, a small distinction.  The

24     Court's jurisdiction is based on the allegations of the

25     Complaint in the presence (indiscern.) in the district.  And

1    it's the ownership that, I think, gives trouble to Court as to

2    who moves this ultimately.

3          THE COURT:  Right.

4          MR. GAITAS:  And this is -- that's what the

5    discovery should be aimed at.  It's not on jurisdictional

6    issues as to who is subject --

7          THE COURT:  Well, but that does go to the

8    jurisdiction because if the ownership -- if Geden, in fact,

9    owns the ship, then the prima facie element, number one, would

10   not be met.

11         MR. QUARTARO:  I'm sorry, Your Honor.  I didn't

12   quite catch that.

13         THE COURT:  I know you didn't and I'm just --

14         MR. GAITAS:  If Geden Holdings, I think, you mean

15   owns the ship.  Geden Holdings itself  owns the ship.

16         THE COURT:  Okay.  So the issue does Plaintiff have

17   a valid prima facie admiralty claim against the Defendant, the

18   Defendant cannot be found within the district.  And if you

19   are, in fact, right that the Defendant is within the district

20   then the elements under 4(f) have not been met.  And so that's

21   one of the issues.  And that issue is tied up with ownership.

22         MR. GAITAS:  But Geden Holdings, itself, we have not

23   pled them as an owner of the assets.  It's Space Shipping and

24   Space Shipping is not present in the district.  I don't think

25   any discovery will yield a contrary result.

1           THE COURT:  Well, so what's your point about -- give

2     me your point about the entity that's in this district.

3           MR. QUARTARO:  The Plaintiffs have alleged a chain

4     of alter egos which flows from Plaintiff's contractual

5     relationship with Space.  Space is owned by Geden Holdings, as

6     the Plaintiffs have alleged, that's their work chart.  That's

7     their allegation.  So our on chart Space owned by Geden

8     Holdings.  It might be helpful if I just point at it.  And so

9     our problem here is that they're alleging this chain of alter

10    egos.  They're saying --

11          THE COURT:  They're not saying -- but he said he's

12    not alleging alter egos.

13          MR. QUARTARO:  But -- well, I --

14          THE COURT:  But that's argument, but that's not what

15    he says in his Complaint.

16          MR. QUARTARO:  Okay.  Well, I appreciate what Your

17    Honor is saying, but in that case and if we look at the

18    Complaint, how do they connect these two houses, and they have

19    to get to the owners.

20          THE COURT:  But isn't that the issue that I can't

21    decide that issue right now.  So you need discovery on that

22    issue and you need to tell me about that issue with

23    evidentiary support.

24          MR. QUARTARO:  I -- yes.

25          THE COURT:  Otherwise, I can't rule on this issue.

1            MR. QUARTARO:  Yes, Your Honor.  I understand --

2    what I'm taking from this from Your Honor, but please correct

3    me if I'm getting this wrong.  What I'm understanding from

4    Your Honor is you want to see certainly the discovery,

5    assuming we can agree on it.  Let's just call it the

6    discovery.  The results of the discovery, all right, on these

7    relationships because this is what our opponents are saying

8    creates liability here.

9            THE COURT:  Correct.

10           MR. QUARTARO:  This is why they say we have a claim

11   against Space, but I can get Advantage Avenue --

12           THE COURT:  Absent that discovery, all I know is

13   that you're saying X and you're saying Y, but there's nothing

14   that allows me to decide who is right.  And I'm not going to

15   just pick a side out of the -- out of thin air --

16           MR. QUARTARO:  Sure, sure.

17           THE COURT:  -- and make a decision.  I need some

18   facts.  So the discovery should be focused on that issue.

19           MR. QUARTARO:  But, Your Honor, I would just say the

20   order -- that that discovery has been heard.  That's exactly

21   what the order says.

22           THE COURT:  I got it.

23           MR. QUARTARO:  And so let's just use that.  We've

24   got the depositions --

25           THE COURT:  But he just told me that, you know, we

1    already established you've got some negotiating to do as to

2    whether that discovery can be used here.  And he said that he

3    has additional discovery to do.  So you are going to have to

4    have some pretty significant discussion about what that

5    discovery is.  And in this Court, there are local rules and I

6    also have some rules with respect to the kind of discussions

7    you have to have.  They have to be very full, very thorough.

8    If you have any disputes, you're going to give me -- send me a

9    letter and we'll talk about it.  But you will only send me a

10   letter if you've already had very significant discussions.

11   And if the disputes spiral into just a whole series of

12   letters, he said/she said or he said/he said, what I'm going

13   to do is just bring you in and put you in this Courtroom

14   together for however long it takes in order to resolve them.

15        So, you know, I can't be the babysitter.  Okay?

16        MR. QUARTARO:  Your Honor, we understand that.

17   Mr. Gaitas and myself, this is not our first case across from

18   each other.

19        THE COURT:  I assumed that.  I assumed that.

20        MR. QUARTARO:  And I think -- I would say this, and

21   I know he would agree, whatever the merits of this battle are,

22   they are.  That has certainly never intruded on my

23   relationship with opposing counsel.  Certainly in the Texas

24   case, we've been able to work together.  In other cases, we've

25   been able to work together.  I, of course, have been in and

1    have witnessed many side disputes, we can call them, were that

2    to occur here, it would be the first in a fairly long history

3    of cases I've had against the Chalos firm.  So --

4              THE COURT:  Good.  Well, that's good to know.

5              MR. QUARTARO:  -- I would believe that we could

6    probably work that out.  What I'm concerned about, of course,

7    is repeating exactly what we've already done.  That is a

8    concern.  We've already done the deposition of Mr. Kahoost

9    (phonetic), for example, and maybe we figure this out and

10   maybe this is something that has to be brought forward, but

11   are we going to go and ask him the same questions that we've

12   already asked in Texas?  I mean, what are --

13             MR. GAITAS:  Of course not.  That's ridiculous.  We

14   would never do something like this.

15             THE COURT:  Okay, so it seems to me that there's no

16   reason, except for the purpose of being obstructive, and I am

17   taking it on faith that you are not going to be obstructive,

18   to repeat exactly the same discovery that has occurred

19   already.  In my view, the only discussion that has to be had

20   is how much of that discovery can be used in this case.  And

21   if the negotiations occur and there's a decision that, in

22   fact, all of it can be used in this case, then the question is

23   what else is needed.  And I assume, again, that Mr. Gaitas is

24   going to come up with whatever he needs and then you're going

25   to have a discussion with him about whether you think it's

1   duplicative or not.

2           MR. QUARTARO:  I think we can take it from there and

3   if there is an issue, we'll bring it to Your Honor's attention

4   exactly the way you have instructed us to do.

5           THE COURT:  Okay.  So you're going to have 60 days

6   of discovery, 30 days for a brief, 10 days for a response, 5

7   days for a reply, and then we will set up an evidentiary

8   hearing giving me sufficient time to really analyze the briefs

9   and the evidentiary submissions at some point thereafter.  And

10  my deputy will be in touch with you to determine when it works

11  for you.

12      In the meantime, I -- quite frankly, I don't know what

13  the Coast Guard usually does in these cases.  I'm assuming

14  that you do.

15          MS. REEVES:  No, I certainly don't, Your Honor.

16          THE COURT:  You stood up.  I thought you were going

17  to tell me exactly what they're going to do.

18          MS. REEVES:  No, Your Honor, I don't, but Mr. Ennis

19  -- he is here.

20          MR. ENNIS:  Good afternoon, Your Honor.

21          THE COURT:  Is that -- are you the Coast Guard?

22          MR. ENNIS:  No, I'm with the United States Marshal

23  Service.  We're the ones who have the vessel under arrest.

24          THE COURT:  Okay.

25          MR. ENNIS:  The Coast Guard has been contacting our

1    office on a daily basis.  Currently, the ship is anchored at
2    Marcus Hook Anchorage, which in effect means it's sitting at
3    anchorage in the middle of the Delaware River at Marcus Hook.
4    The Coast Guard is claiming it's interfering with navigation
5    on the river.  Marcus Hook Anchorage is a very busy anchorage
6    and it's interfering with that anchorage.  They would like to
7    have it moved.  The issue is moving it somewhere in the orders
8    of Eastern Pennsylvania, there's really no anchorages that are
9    in the Eastern District of Pennsylvania.  Nobody really knows
10   what the boundaries are in the river.  They've never really
11   firmly been established of what constitutes New Jersey and
12   Pennsylvania.
13        They would like it moved to one of two different
14   anchorages.  One is Kaighn's Point, which is -- when you
15   Google it, Camden actually runs Kaighn's Point Anchorage.  And
16   the other is Ready Point, which is all the way down in
17   Wilmington.  So that would clearly be Delaware.
18        Now, what they're telling me is they've had meetings
19   today, this morning, and they want to issue a captain of the
20   port order to the ship and to the agent of the ship to move
21   that ship because it's interfering with the navigation of the
22   river.  So I expressed those concerns to the Plaintiff.  And
23   right now, there's really kind of odds of where we're going to
24   put this ship --
25             THE COURT:  Okay.

1          MR. ENNIS:  -- while it's sitting because they do

2     not want it in the middle of the river months on end.

3          THE COURT:  And I can understand that.  So what's

4     the response?

5          MS. REEVES:  I have a -- I think I have a solution.

6     I believe from my research that this Court has jurisdiction

7     all the way to the New Jersey side of the river and the

8     District of New Jersey comes here, but it's not crystal clear.

9     I think -- on the other hand, I don't think that the vessel

10    should go out of your jurisdiction into Delaware.  So I had

11    spoken briefly to Mr. Whelan, who I'm not sure spoke to his

12    co-counsel.  I think if we can agree that there's no objection

13    to having her go to the anchorage that is near Camden and Your

14    Honor would order that, and we both agree that it's still

15    within the jurisdiction, that would satisfy the Coast Guard

16    and get the Coast Guard off the Marshal's back.  Because the

17    Marshal is actually the custodian right now of the vessel.

18          THE COURT:  So it sounds, theoretically, like a good

19    way to go.  The problem is that -- these jurisdictional

20    niceties, if in fact that New Jersey port is not within this

21    Court's jurisdiction, then suddenly we have a ship that is

22    outside of my jurisdiction.  So the question there is -- a

23    legal question is, how far does the jurisdiction go.  And you

24    said maybe it goes all the way to the edge of the river.

25          MS. REEVES:  Your Honor, I have a case from quite a

1   while ago from New Jersey about some kind of car accident or

2   crime that occurred on a bridge between New Jersey and

3   Philadelphia.  And that Court said, I have it hear, said -- it

4   was a New Jersey State Court, but that Court said that there's

5   a compact that predates the Constitution between New Jersey

6   and Pennsylvania that says at least for law enforcement

7   purposes, that each state, Pennsylvania and New Jersey, has

8   concurrent jurisdiction over the Delaware River.  That's as

9   close as we could find.  I know Mr. Ennis has had this --

10          THE COURT:  So what -- so does that mean the

11   Delaware River, as long as you're not touching the port of the

12   other side or --

13          MS. REEVES:  I think as long as you're not above

14   the --

15          THE COURT:  -- when does the waters lapping stop.

16          MS. REEVES:  -- high or the low water line where the

17   tide goes up and down.  That's what that case says.  There is

18   no case that says the Eastern District of Pennsylvania's

19   jurisdiction ends here.  But I think if we all agree, I don't

20   think there's anyone to --

21          THE COURT:  It doesn't matter if you agree.  If I

22   don't have jurisdiction, I don't have jurisdiction.

23          MS. REEVES:  Okay.

24          THE COURT:  You can agree on anything, I still don't

25   have jurisdiction.

1      So the second way of possibly thinking about it -- is

2  that what you were going to say?

3      MR. WHELAN:  Your Honor, my only point was -- first

4  of all, just so everyone's clear, is I've heard Your Honor say

5  a dock.  This ship is never -- when it has been under

6  attachment, it's always been at an anchorage.

7      THE COURT:  At an anchor, okay.

8      MR. ENNIS:  It's always been in water.

9      MR. WHELAN:  Right, it's always been at an anchor.

10      THE COURT:  So if it were to go to the New Jersey

11  side, it would not be in a dock, it would be at an anchor?

12      MR. ENNIS:  It's actually not a -- it's not docked

13  in New Jersey.  It's actually in the Delaware River.  But for

14  some reason when you Google the Kaighn's Point Anchorage, it

15  comes up as -- I guess they have offices in Camden is probably

16  what's happening.  I've been doing this for many, many years.

17  This is dozens of ships we've had, and this is always an

18  issue.  And nobody can clearly -- even the Coast Guard can't

19  clearly say where the state boundary is in the river.  Some

20  say it's in the center of the river.  Some say it's to the

21  water line.  Delaware -- I know Delaware claims that all the

22  way to the water line on the New Jersey bank, but New Jersey

23  always pushes back on Delaware and saying no, it's in the

24  center of the river.

25      So nobody really knows.  But the ship isn't docked at a

1    dock.  It's not docked --

2             THE COURT:  Okay.

3             MR. ENNIS:  -- on a dock on the New Jersey coast.

4    It's in the river.

5             THE COURT:  Okay, so --

6             MR. ENNIS:  It's on the water.

7             THE COURT:  So the next question, one possible way

8    of looking at it is that given that I had jurisdiction at a

9    time the ship was impounded, does agreeing to allow the ship

10   to be -- and the order does allow the ship to be moved around.

11   But does allowing it to be moved around to the opposite side

12   of the Delaware deprive me of jurisdiction?

13            MS. REEVES:  Your Honor, I saw a case getting ready

14   for this and I'll have to find it, that says even if the

15   (indiscern.) leaves the jurisdiction, the Court still has

16   jurisdiction over the case, but maybe not the ship.  But I

17   don't think so.  I think you would still have jurisdiction,

18   Your Honor.

19            THE COURT:  Well, I think you have to -- I think

20   this is something that you have to look at because -- and you

21   have to do it pretty quickly because there -- this could

22   actually create a danger in the waterway.

23            MR. ENNIS:  Correct, Your Honor.  That's the Coast

24   Guard's position.

25            THE COURT:  So I think given that you're interested

1    in maintaining jurisdiction here, because you don't want to

2    have to start this whole thing again in New Jersey, I think it

3    behooves you to look at those jurisdictional issues and to

4    perhaps talk to the other side, figure it out, and you must

5    satisfy the Court that I would have jurisdiction if you were

6    to move it to the other side of the river.  And if both of you

7    agree that, in fact, I would and I read the case law and I

8    determine that I do, then I'm happy to sign an order allowing

9    it to be moved to the other side of the river.

10            MS. REEVES:  Your Honor, if I might, I do -- not

11   that anyone's going to decide, I realize, in a second.  But I

12   do -- I did bring the case law that says that in the river

13   itself, that the police powers, you know, the marina police,

14   for example, you know -- the Philadelphia marina police can

15   enforce drug boating laws or whatever on the Jersey side of

16   the river and vice versa.  I'm happy to share that with

17   opposing counsel and the Court.  I honestly was quite

18   exhaustively looked at this --

19            THE COURT:  But that's just about police powers,

20   which is not jurisdictional.  It's not a jurisdictional issue.

21            MS. REEVES:  There is no -- I can represent to the

22   Court to the best of my ability, I spent quite some time on

23   it, that I can't find anything on that.

24            THE COURT:  And you found nothing on if I -- the

25   (indiscern.) is in my jurisdiction when it's impounded, it's

1   okay to move it.

2          MS. REEVES:  No, I haven't found anything that talks

3   about the outer limits of your --

4          MR. WHELAN:  It's okay to move it within the

5   jurisdiction.

6          THE COURT:  We all know that.

7          MR. WHELAN:  It's just -- Your Honor, we do have --

8   I do have some case law back in the office.  I don't have it

9   with me now on this issue.

10         THE COURT:  Okay.

11         MR. WHELAN:  So I -- we could try to get together

12  and talk about it.

13         THE COURT:  Yes.  Why don't you try and get together

14  and figure it out because I think, you know, now that we've

15  taken the pressure out of getting my issue decided because

16  we've got the discovery and the briefing schedule.  Really the

17  issue now is what to do with the ship.  And I think there's a

18  number of elements to that.  One is what to do with -- can we

19  move it.  And then the second issue is when is the Turkish

20  holiday over?

21         MR. QUARTARO:  I believe that it end this week, Your

22  Honor.

23         THE COURT:  So how long is this holiday?

24         MR. QUARTARO:  I am not a member of that faith, nor

25  am I Turkish, but I believe it is approximately a week, Your

1    Honor.

2            THE COURT:  What is it?  It's Ramadan?

3            MR. QUARTARO:  Eid, I believe.

4            THE COURT:  Eid.  Does anyone know how long Eid

5    lasts for?

6            UNIDENTIFIED SPEAKER:  I believe it's a week.  I

7    believe it may be sundown our Sunday and Saturday, but I'm not

8    absolutely positive.

9            THE COURT:  Okay.

10           UNIDENTIFIED SPEAKER:  But I think it's a week long

11   holiday.

12           MR. QUARTARO:  I believe that's correct.  I would

13   say, of course, going back and forth with the client over the

14   last week, there were a couple of things that they just could

15   not manage, one of which -- today, for example, is the first

16   time somebody could get into an office and get stuff copied

17   and scanned.

18           THE COURT:  Okay.

19           MR. QUARTARO:  So I'm thinking we're through the

20   week.

21           THE COURT:  Okay.  So I think there's -- there's two

22   aspects.  One is the ship and one is -- or where are we going

23   to move this thing, which I think is a -- we've got to figure

24   that out in the next 24 hours, otherwise the Coast Guard may

25   storm the federal building.  And then the second issue is

1    whether we can take the heat out of this by posting a security

2    bond in the Registry of the Court.  And I think that's

3    something that only you can work on.  And obviously, if that

4    is not going to happen after you spoke to your clients, then

5    you've got to have a conversation with opposing counsel to --

6    so that you can put that idea to rest.  But I hope that that

7    can somehow be resolved.

8         MR. GAITAS:  It shouldn't be a difficulty -- major

9    difficulty, Your Honor, for the other side to provide

10   security.  I noticed Mr. Quartaro said this his client is

11   Turkish.  His client isn't Turkish.  His client is Marshal

12   Islands and Marshal Islands come -- I don't know who the

13   Turkish people are that control the money.  That raises a real

14   issue here.  So Eid and these holidays should not interfere.

15        THE COURT:  Well --

16        MR. GAITAS:  Unless all the banks are in Turkey.

17        THE COURT:  Maybe, but that's what he's saying and I

18   don't have any reason to doubt him.  You know, things are

19   registering in all sorts of places all over the world.  It

20   doesn't mean that --

21        MR. GAITAS:  Indeed, they are.

22        THE COURT:  -- you know, the people who make the

23   decisions are in those particular places.  Okay.  Anything

24   else?

25        MR. WHELAN:  Two items on our side, Your Honor.

1            THE COURT:  Okay.

2            MR. WHELAN:  The first is we are, of course,

3    expecting at any time action from the Court in Texas.  So I

4    would respectfully request, Your Honor, that if that occurs

5    during this period, that we have the Court's permission to

6    draw your attention to whatever that order is.

7            THE COURT:  You can draw my attention to anything

8    you'd like.

9            MR. WHELAN:  Thank you, Your Honor.  I appreciate

10   that.  The other thing is since we are going to head down the

11   discovery road, it may then make sense, we have provided our

12   statement of material fact and the exhibits.  And so it

13   probably then makes sense to move those into evidence now.

14   That way Your Honor has something.  We'll add to it with

15   whatever we're going to add to it, but at least --

16           THE COURT:  Let's wait until the evidentiary

17   hearing, because I would prefer to have everything together

18   rather than having bits and pieces now and then bits and

19   pieces later on.

20           MR. WHELAN:  Okay, thank you, Your Honor.

21           MS. REEVES:  Your Honor, if I may.  In terms of the

22   next 24 hours, it is Friday afternoon, do you want us to

23   contact you through the clerk or something over the weekend

24   about moving the vessel potentially?

25           THE COURT:  Well, the U.S. Marshal has -- you have

1    my cell phone, right?  I'm sure someone --

2              MR. ENNIS:  Someone in my office does.

3              THE COURT:  Someone has it.  So if you really --

4              MS. REEVES:  And I have his number.

5              THE COURT:  Right.  So if you need me, you know,

6    I'll be -- I'm 15 minutes away from the Courthouse.  I'm also

7    available by telephone.  The U.S. Marshal will contact me, not

8    you.  And, you know, we'll -- you don't have to report to me

9    if the issue is resolved and every -- well, wait a minute.

10   No, you do have to report to me because it's a jurisdictional

11   issue, yes.

12             MS. REEVES:  Unless we can find a birth on this side

13   of the river, but I don't know how we do that will be --

14             THE COURT:  Okay.  What you will do is if you have

15   determined the jurisdictional issue and you have a filing with

16   respect to the jurisdictional issue, you're going to e-mail it

17   to my federal Judge account rather than to the chambers

18   account.  And, Michael, do you know what my -- yes, he's going

19   to give you my -- it's not my personal e-mail, but my federal

20   Judge e-mail.  So I have my iPhone on me at all times and

21   we'll be able to read it if you file something.  If there is a

22   need for a phone call or something other than just filing the

23   document, then go through the Marshal and we'll set something

24   up.  Because if we need a hearing, I need the Marshal to open

25   up -- I need someone in the Courthouse, right?

1          MR. ENNIS:  The CSO's are at the Courthouse 24/7.

2     They're always here.

3          THE COURT:  Even on the weekends?

4          MR. ENNIS:  Even on the weekends, they're here.

5          THE COURT:  Okay.  Okay.  So I think that way I can

6     get any information I need and if you need anything more than

7     just something to file, or if you need me to sign an order,

8     you can -- essentially, if you need more than just filing

9     something, you can go to the U.S. Marshal and he'll get in

10    touch with me.

11         MS. REEVES:  Sorry to bother you about this, Your

12    Honor.

13         THE COURT:  That's okay.  Anything else?

14         UNIDENTIFIED SPEAKER:  Your Honor, just so I'm clear

15    on the procedure here.  If we -- if there is an agreement,

16    file that agreement in the form of a consent order for Your

17    Honor's approval, send it to your e-mail first or file it, or

18    both?

19         THE COURT:  File it and send it to the e-mail.

20         UNIDENTIFIED SPEAKER:  That we're going to receive

21    in a moment?

22         THE COURT:  Right.

23         UNIDENTIFIED SPEAKER:  Okay.

24         THE COURT:  And I will not be able to sign it when

25    there's no -- the Clerk's Office is not open.  I'm not going

1    to be able to actually physically sign it.  But what I can do

2    is I will respond to all of you and say this is acceptable and

3    it will be signed on Monday.  But because it's a

4    jurisdictional thing, you have to include some kind of -- it

5    can't just be (indiscern.) jurisdiction.  There has to be some

6    analysis as to why you all believe that I have jurisdiction.

7    So I think that if I have jurisdiction, if I move it -- if you

8    move it across the Delaware.  So that seems to me to be a --

9    not -- it's not a point/counterpoint issue, either you all

10   agree that I would have jurisdiction if it was moved or you

11   all -- or one of you does not agree.  So if all of you agree

12   that I have jurisdiction if the boat is moved, then you're

13   going to just provide me with an analysis of your conclusion

14   and that will allow me to sign off on the order.

15            MS. REEVES:  Understood, Your Honor.

16            THE COURT:  Okay?  Anything else?

17            MR. GAITAS:  Not from the Plaintiff.

18            MR. QUARTARO:  Not from the Advantage Defendants,

19   Your Honor.

20            THE COURT:  Okay.  Anything from the U.S. Marshal?

21            MR. ENNIS:  No, Your Honor.

22            THE COURT:  Okay.  Thank you very much.

23            THE CLERK:  All rise.

24        (Court adjourned)

25

98

```
 1                           CERTIFICATION
 2    I certify that the foregoing is a correct transcript from the
 3    electronic sound recording of the proceedings in the above-
 4    entitled matter.
 5
 6
 7    Lewis Parham                           10/5/16
 8
 9    _____          _____
10    Signature of Transcriber                  Date
```